# RENZULLI, PISCIOTTI & RENZULLI, LLP

300 EAST 42ND STREET
NEW YORK, NY  10017-5947
TEL (212) 599-5533
FAX (212) 599-6385

February 21, 2003

**VIA FACSIMILE & FEDERAL EXPRESS**

Honorable Cheryl L. Pollak
Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    NAACP v. A.A. Arms, Inc., et al.
           Docket No.:  CV-99-3999 (JBW)

Dear Magistrate Judge Pollak:

      As promised, we are respectfully submitting for the Court's review copies of excerpts from the depositions of our clients, who were also involved in the Boston litigation, where Boston incidents were disclosed.

                Respectfully submitted,

           **RENZULLI, PISCIOTTI & RENZULLI, LLP**

              */s Leonard Rosenbaum*

              Leonard Rosenbaum

cc:    Elisa Barnes, Esq.

       Defense Counsel

1

```
 1

 2   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 3   ----------------------------------------------x
     NATIONAL ASSOCIATION FOR THE
 4   ADVANCEMENT OF COLORED PEOPLE,    99 CV 3999 (JBW)
     NAACP,                           99 CV 7037 (JBW)
 5
                           Plaintiff,
 6
                   -against-
 7
     AMERICAN ARMS, et al.,
 8   ACUSPORT CORP., et al.,

 9                    Defendant.
     ----------------------------------------------x
10                           July 19, 2002
                             9:28 a.m. - 3:32 p.m.
11
         CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
12

13        Videotaped Deposition of PAUL JANNUZZO,

14   taken by Plaintiff, at the offices of Renzulli,

15   Pisciotti & Renzulli, LLP, 300 East 42nd Street,

16   New York, New York, before Ellen Marie Neary

17   Gumpel, a Certified Shorthand Reporter,

18   Registered Professional Reporter and Notary

19   Public within and for the State of New York.

20

21

22           DAVID FELDMAN & ASSOCIATES (USA)

23            575 Madison Avenue, 10th Floor

24               New York, New York 10022

25        (212) 921-0771    Fax: (212) 921-0718
```

146

```
 1                    PAUL JANNUZZO
 2              Do, do any of your sales managers
 3    look at the number of firearm trace requests that
 4    any dealer has?
 5         A.    No, ma'am.
 6         Q.    Is that information contained in any
 7    of the documents that the stocking dealer is
 8    required to submit to you?
 9         A.    No, ma'am.
10         Q.    Did you ever consider asking or
11    having your sales staff review the number of
12    trace requests received by a dealer as one of the
13    criteria as to whether or not that dealer should
14    become one of your stocking dealers?
15         A.    No, ma'am.
16         Q.    And you never considered it?
17         A.    No.
18         Q.    Do you know what a -- you, you know
19    what a trace request is?
20         A.    Yes, ma'am.
21         Q.    You get them at Glock, correct?
22         A.    Yes, we do.
23         Q.    And you know that they're -- that
24    they are requests by BATF for information about
25    crime guns; is that fair?
```

147

                        PAUL JANNUZZO

1

2       A.      No.  It's not a --

3               MR. JOHN RENZULLI:  Objection to

4   form.

5       A.      I don't think it's even close.  As a

6   matter of fact, I think it's almost a 100 percent

7   misrepresentation of what they are.

8       Q.      Okay.

9               Tell me what they are.

10      A.      They are a request for a trace on a

11  pistol or a handgun or a rifle, I guess depending

12  on who you are.  But if nothing else, we

13  certainly know from these municipal lawsuits they

14  are sure as heck not crime guns all of them.

15      Q.      And why do you say that?

16      A.      Well, in Boston, I don't recall off

17  the top of my head how many guns we had that were

18  traced as a result of shooting a dog or a police

19  officer losing momentary control of it.  I know

20  from the ATF's own documents that they are --

21  these requests are guns that may be crime guns

22  or -- are crime guns or may be crime guns.  I

23  know from -- I can't think of his name right now,

24  but actually, I think he is one of your witnesses

25  who filed an affidavit sometime ago talking about

148

```
 1                    PAUL JANNUZZO
 2   basically in 97 percent of these come from local
 3   law enforcement and that there is no requirement
 4   that they note the reason for the request.  I
 5   know that ATF says that sometimes it's just a gun
 6   that is suspected of being a crime gun.  I know
 7   the overwhelming majority of them have noted on
 8   their -- what is it, the category is firearms
 9   defense, which in my mind is probably not a crime
10   gun if you define a crime gun as a gun used in
11   the commission of a crime.  That could be
12   discharging a weapon within city limits.
13        Q.    It could also be trafficking,
14   couldn't it be, Mr. Jannuzzo?
15        A.    It could be, but you know --
16        Q.    It could be selling it to a minor,
17   couldn't it be?
18        A.    Could I finish my  -- could I finish
19   my question -- my answer?
20              MR. JOHN RENZULLI:  Finish up;
21   finish up.
22        A.    It, also -- you know, in the
23   documents we've received from both Boston and
24   California, not a single -- no.  Strike that.
25              Out of all the instances listed from
```

149

```
 1                    PAUL JANNUZZO
 2   the seven municipalities in California and the
 3   City of Boston, there was one trafficking
 4   incidence, incident by a boy -- and it was a
 5   wicked Irish name -- Sean Tooney, who was caught,
 6   arrested, prosecuted and put in jail.
 7                    So once again, the system worked
 8   just like it should.
 9                    And the other one was a police
10   officer who bought it for her boyfriend and he
11   was a prohibited person.
12                    But out of those eight
13   municipalities, who have accused us of these
14   negligent distribution practices, there was one
15   of their employees and one other person that were
16   involved in some sort of unlawful purchase.  And
17   frankly, it was an unlawful purchase on their
18   side, especially when a police officer walks into
19   a store, I don't know how a dealer is supposed to
20   know that that sale shouldn't be consummated.
21                    MS. BARNES:  Could you do me a favor
22   and read me back his answer or just let me look
23   at it on the screen.
24                    (Discussion off the record.)
25                    VIDEO TECHNICIAN:  The time is now
```

150

```
 1                    PAUL JANNUZZO
 2   approximately 12:36 and we're going off record.
 3             (Recess:  12:36 p.m. to 12:52 p.m.)
 4             VIDEO TECHNICIAN:  The time is now
 5   approximately 12:52; we're back on record.
 6        Q.    Mr. Jannuzzo, you made reference to
 7   two instances of a -- of evidence developed or
 8   presented in cases in Boston and in the
 9   California cases?
10        A.    Yes, ma'am.
11        Q.    I'd like to just go through that
12   with -- for a second with you.
13        A.    Sure.
14        Q.    Did you -- have you yourself ever
15   reviewed the compilations obtained from BATF of
16   firearms that were traced in crime?
17             MR. JOHN RENZULLI:  Objection as to
18   form.
19             You may answer.
20        A.    I don't understand the question.
21        Q.    Okay.
22             Have you ever -- BATF provides --
23   well, let me strike that.
24             Do you -- are you aware of a thing
25   or a document called the BATF Firearms Trace
```

173

```
  1                    PAUL JANNUZZO

  2        A.    I don't know.

  3        Q.    More than five in any one of those

  4   years?

  5        A.    Doubtful.

  6        Q.    More than two in any one of those

  7   years?

  8        A.    You, you just asked me specifically

  9   how many times.  I told you each time that I

 10   don't know.  I still don't know.

 11        Q.    Okay.

 12              So now I want to go back to your

 13   statement --

 14        A.    Uh-huh.

 15        Q.    -- that you made with regard to

 16   information that you say came out of the Boston

 17   and the California lawsuits.

 18        A.    Okay.

 19        Q.    What I would like to know is: Have

 20   you seen paper compilations of the crimes

 21   attached to firearms traced in connection with

 22   either the Boston or the California lawsuits?

 23        A.    I don't know if I'd seen

 24   compilations.  I know I've seen investigatory

 25   reports, which, to me, just simply pointed out
```

174

```
 1                    PAUL JANNUZZO
 2   the fact that the traces by themselves don't tell
 3   you a lot until you know what the underlying
 4   investigation was.
 5                    (Stacy Deere joined the deposition
 6   telephonically.)
 7        Q.    Okay.
 8                    What are these investigatory reports
 9   that you've seen?
10        A.    They are exactly as they are
11   indicated by their title, investigatory reports.
12        Q.    By whom?
13        A.    By the agency that was investigating
14   the gun discharge, the transaction or whatever it
15   may be.
16        Q.    Okay.
17                    And are you talk -- let's take first
18   the City of Boston.
19        A.    Okay.
20        Q.    Are you talking about one
21   investigation report or more than one
22   investigation report?
23        A.    More than one.
24        Q.    How many are you talking about?
25        A.    I don't know, Ms. Barnes.
```

175

```
 1                          PAUL JANNUZZO
 2          Q.      How many have you seen with regard
 3   to the number of Glock firearms maintained in the
 4   Firearms Trace Database and presented in the
 5   connection of the City of Boston's lawsuit?
 6          A.      I didn't know a second ago; I still
 7   don't.
 8          Q.      Is it -- so it's, it's more than one
 9   though?
10          A.      Yes, ma'am.
11          Q.      Is it more than ten?
12          A.      It's however many they supplied us,
13   ma'am.
14          Q.      How many was that?
15          A.      You'll be surprised to hear this,
16   but I still don't know.
17          Q.      Well, was it more than a thousand?
18          A.      No.  It definitely was not more than
19   a thousand.
20          Q.      Was it more than a hundred?
21          A.      I don't believe so.  No, ma'am.
22          Q.      Was it a stack of paper that took
23   you more than four hours to read through?
24          A.      I don't know.
25          Q.      How long did you read it?
```

176

1                    PAUL JANNUZZO

2         A.    I don't know.

3         Q.    Did you read it in an afternoon?

4         A.    I don't know.

5         Q.    Do you think it was under ten

6    investigation reports?

7         A.    I don't think so, no because -- no.

8    I don't think so.

9         Q.    Was it by a mem -- was any of these

10   investigation reports that you say you read

11   created by a member of the Boston Police force?

12        A.    I believe the majority of them were.

13        Q.    And were they one page or more than

14   one page?

15        A.    I guess it depends on how thorough

16   the investigation was and I don't recall.

17        Q.    I'm not asking you for your

18   evaluation of the, of the police work by the City

19   of Boston.

20        A.    And you didn't get it.

21        Q.    I'm merely asking you a question --

22        A.    And you didn't get it.

23        Q.    -- as to what you saw --

24        A.    And I answered it for you.

25        Q.    -- and you've made statements here

177

```
 1                      PAUL JANNUZZO
 2    under oath that only a certain number of the guns
 3    recovered in Boston dealt with any crime.  And
 4    I'm trying --
 5            A.     You know, Ms. Barnes --
 6            Q.     -- to find out what the basis of
 7    that information is; that's my sole object here.
 8            A.     Okay.
 9                   Then I want you to under --
10                   MR. JOHN RENZULLI:  Objection as to
11    form.
12            A.     Since you misrepresented my
13    testimony, why don't I try to clear that up,
14    first.
15                   What I didn't -- what I said was not
16    that.  What I said was that those investigatory
17    reports and actually the requests themselves or
18    the incidents themselves upon which the requests
19    were based make it patently clear that every
20    trace request that comes in does not indicate a
21    crime gun.  Some of those guns were fired in the
22    line of duty by police officers and they were
23    traced.
24            Q.     How many?
25            A.     That was the point that start --
```

178

1                    PAUL JANNUZZO

2         Q.      How many?

3         A.      I don't know.

4         Q.      How many were there?

5         A.      Okay.

6                 Which part of "I don't know" don't

7    you get?

8                 MR. NOTTINGHAM:  Objection; asked

9    and answered.

10        Q.      You have made the statement that a

11   number of guns in the trace database do not

12   relate to crime.

13        A.      Right.

14        Q.      And I want to know how many that

15   number is.  Either, either that or you can tell

16   me what percentage.  And I want to know very

17   precisely the basis of the information on which

18   you are making that statement.

19        A.      You know this is so disingenuous

20   because you know the exact same thing, unless you

21   are purposefully blind to the information in your

22   own possession.  I don't know the percentage.  I

23   do not know the number.

24        Q.      Do you --

25        A.      You can ask me 50 times and I still

179

```
 1                    PAUL JANNUZZO

 2   won't know.

 3        Q.     Do you have the documents in your

 4   possession by which you could provide me with the

 5   information as to the number?

 6                    MR. JOHN RENZULLI:   Those documents

 7   are -- for the record are privileged and

 8   confidential pursuant to a protective order in

 9   Boston.

10        Q.     Do you have them in your possession?

11        A.     As I sit here today, no, ma'am.

12        Q.     Do you have them in Smyrna, Georgia?

13        A.     I don't know if I still do or not.

14   We're supposed to be giving that stuff within 30

15   days back to the City of Boston.  And I don't

16   know if it's been returned yet.

17        Q.     Okay.

18               Let's take California.

19        A.     Okay.

20        Q.     How many incidents do you say

21   occurred in the California litigation?

22               And by that, I mean any of the

23   cities in California that are participating in

24   that, that do not involve crime guns.

25        A.     I do not know.
```

180

1                    PAUL JANNUZZO

2        Q.      Is it more than one?

3        A.      Yes.

4        Q.      And --

5        A.      Ms. Barnes, here is what I recall

6    from the Boston cases, if that's okay.

7               There were two that involved the

8    distribution schema, the distribution practices.

9    And those two were actually people who more or

10   less duped the dealer.

11              You see, Boston much like this case

12   alleged negligent distribution.  I am not here to

13   solve crime in society, unwed mothers or drug

14   use.  We're talking about what supposedly is an

15   allegation of negligent distribution.  And you

16   asked me about the trace database.  And this all

17   started as to why our salesmen aren't reviewing

18   traces in stores.  The point I was making is

19   there is no use in them reviewing traces in

20   stores because it doesn't tell them anything.

21              And, in fact, according to the BATF

22   and Senator Schumer, the overwhelming majority, I

23   believe is the language that Senator Schumer used

24   of FFL holders are honest, law-abiding users and

25   sellers and distributors of firearms and that it

181

1                    PAUL JANNUZZO

2     was as low as 1 percent I believe he called them

3     bad apples or maybe he said 1.2 percent and the

4     BATF report that I'm thinking of said 1 percent.

5                    But regardless, I thought the case

6     was about negligent distribution, not crime in

7     society.

8          Q.     Have you spoken with Senator

9     Schumer?

10         A.     No, ma'am.

11         Q.     Then where did you get your

12    information that you're attributing to Senator

13    Schumer?

14         A.     From the report that he issued when

15    he did this bad apple report.

16         Q.     And what is that report called?

17         A.     I just referred to it as the bad

18    apple report; that the only thing I know it by.

19         Q.     And do you know when that report was

20    prepared?

21         A.     Two years ago.

22         Q.     Do you know the date of the report?

23         A.     No, I don't know the time and date

24    it was issued either or what kind of computer it

25    was generated on.

1

```
 1

 2    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 3    99 Civ. 3999 (JBW)
      99 Civ. 7037 (JBW)
 4
      NATIONAL ASSOCIATION FOR THE   :
 5    ADVANCEMENT OF COLORED PEOPLE, :
      et al.,                        :
 6                    Plaintiffs,    :   CONFIDENTIAL
                   -vs-              :
 7    AMERICAN ARMS, et al.,         :
                                     :
 8    - - - - - - - - - - - - - - - -

 9


10

11        Videotaped deposition of GEORGE T. SODINI

12        CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

13        TRANSCRIPT of testimony as taken by and

14    before MARGE TEILHABER, a Certified Shorthand

15    Reporter (License No. XI00856) and Notary Public of

16    the States of New York and New Jersey, at the

17    offices of LAW OFFICE OF ELISA BARNES, LLC,

18    111 Broadway, 4$^{th}$ floor, New York, New York, on

19    Thursday, July 25, 2002, commencing at 4:49 in the

20    afternoon.

21

22           DAVID FELDMAN & ASSOCIATES (USA)

23            575 Madison Avenue, 10th Floor

24               New York, New York 10022

25         (212) 921-0771    FAX:  (212) 921-0718
```

1      indication on the request itself that you're being

2      asked to provide information in connection with a

3      criminal investigation?

4                      MR. RENZULLI:   Object as to form.

5      A.  I think on the top of the trace,  doesn't it

6      say this could be -- I haven't looked at one.  If

7      you got one,  it says something about this gun, this

8      request, this trace request is about a crime, it

9      could be a crime or something.  But it's just --

10                 MS. BARNES:  Could you mark this

11     Import Sports-5?

12                 (Exhibit Import Sports-5, Bureau

13     of Alcohol,  Tobacco and Firearms, National Tracing

14     Center, marked for identification.)

15                 Q.   Could you look at Import Sports 5

16     and tell me- if you've ever seen one that's not

17     filled out in the same way obviously that this one

18     is filled out but have you ever seen this basic

19     form?

20     A.       I've seen this form and I've seen other

21     forms,  like I mentioned before, the one that they

22     come in by mail.  It's a different type of form

23     than this but this is the general form we receive.

24     Q.       And it's a fax?

25     A.       It's a fax form.

87

1    Q.      What does it say at the top under

2    the heading ATF?  What does the next line say?

3    A.      II Information requested below is needed to

4    assist in a criminal investigation.  Please return

5    this completed form to the ATF within 24 hours of

6    receipt."

7    Q.      Do you have some information that

8    any given trace that you receive is not part of a

9    criminal investigation?

10   A.      Yes, I do.  As I mentioned to you before,

11   the traces that we received regarding the Boston

12   case.

13   Q.      How did you find out what the

14   underlying action or issues were in those two

15   instances?

16   A.      It was on a police report.

17   Q.      Oh, you got a copy of the police

18   report?

19   A.      Yes, in the case.

20   Q.      Any other way?

21   A.      No.

22   Q.      Mr. Sodini, do you ever advertise?

23   I'm sorry.  Strike that.

24   Do you know what a spiff is?

25   A.      Yes.

1

```
1

2                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF NEW YORK
3                99 Civ. 3999 (JBW)
                 99 Civ. 7037 (JBW)
4
NATIONAL ASSOCIATION FOR THE   :
5  ADVANCEMENT OF COLORED PEOPLE, :
   et al.,                        :
6              Plaintiffs,     :  CONFIDENTIAL
              -vs-              :
7  AMERICAN ARMS, et al.,         :
                                  :
8  - - - - - - - - - - - - - - - -

9

10      Videotaped deposition of GEORGE KELLGREN,

11   taken in the above-entitled matter before

12   ILONA LUPOWITZ, a Certified Shorthand Reporter

13   and Notary Public, taken at the offices of

14   Renzulli, Pisciotti & Renzulli, 300 East 42nd

15   Street, New York, New York, on Friday, August

16   9, 2002, commencing at 9:41 a.m.

17

18

19

20

21

22         DAVID FELDMAN & ASSOCIATES (USA)

23          575 Madison Avenue, 10th Floor

24             New York, New York 10022

25        (212) 921-0771    FAX:  (212) 921-0718
```

144

| | | |
|---|---|---|
| 1 | | GEORGE KELLGREN |
| 2 | A. | Not really. |
| 3 | Q. | Can you tell me why? |

4    A.    We consider that just to be a law

5  enforcement tool.  We do not know how those

6  guns were recovered.  We do not know if they

7  were involved in a crime at all.  We actually

8  have had cases with Kel-Tec guns where we have

9  seen the police report.  It was in Boston and

10  in California, where the guns were traced, and

11  they were actually not involved in -- in -- in

12  a gun crime.  There was one that was found in a

13  domestic dispute, one was used by a licensed

14  carrier, and one was found on the playground.

15  But none of them were, actually -- did show

16  that they were not properly distributed.

17          So just seeing those -- the

18  Kel-Tecs we know about, that has made us to

19  draw the conclusion that for us, for Kel-Tec as

20  a manufacturer, you cannot use that

21  information.  Because it -- it's the raw data

22  from the ATF that they use for investigating

23  purposes.

24    Q.    I don't know the particulars of

25  what you've seen in any police reports from any

145

1                    GEORGE KELLGREN

2    litigation.  But, Mr. Kellgren, do you think

3    that a gun left on a playground was just

4    dropped?

5          A.     Yes.

6          Q.     Oh, you do.

7          A.     It could happen.

8          Q.     Whether or not you think it could

9    happen, do you have any informed basis in which

10   to say that the presence of a gun on a

11   playground is necessarily a holy, non-criminal

12   event?

13         A.     It is -- of course, it is -- it

14   does not show yet that the gun has been used in

15   a crime.  But to leave it on a playground is

16   highly irresponsible.  Unless it was dropped

17   there.  It was not on purpose.

18              MR. RENZULLI:  Highly?

19              THE WITNESS:  Irresponsible.

20         Q.     And you've, certainly, heard of

21   instances where people fleeing from crimes or

22   from the commission of a crime or from a crime

23   scene have been known to toss a gun away from

24   their person so that they are not recovered

25   with the firearm on their person.  You have

146

```
 1                 GEORGE KELLGREN

 2   heard of those instances.

 3        A.     That could happen, yes.

 4        Q.     And those instances happen, they

 5   are thrown in garbage cans.

 6        A.     Um-hum.

 7        Q.     In bushes.

 8        A.     Yes.

 9        Q.     And the recovery of those guns

10   would be considered found guns, correct?

11        A.     Yes.

12        Q.     And -- but those guns are,

13   nevertheless, guns that were disposed of in --

14   in a criminal matter.

15               MR. RENZULLI:  Objection as to

16   form.  Hypothetical.

17        A.     Yes, that is true.

18        Q.     Well --

19        A.     But the other examples that are

20   mentioned there, that was not the case.

21        Q.     The domestic violence, the domestic

22   dispute situation.

23        A.     Yes.  And the gun was found in the

24   house, and it was a legal gun.  It was not used

25   in the dispute itself.  It was just present.
```

147

1                    GEORGE KELLGREN

2        Q.      And what was the other example you

3   gave?

4        A.      It was a licensed carrier that was

5   brandishing the gun.  It was traced and given

6   back to the licensee.

7        Q.      Brandishing.

8        A.      Brandishing.

9        Q.      So somebody thought that there was

10  some threat involved.

11       A.      He got the gun back.  So,

12  apparently, there was no -- nothing criminal --

13       Q.      And those are three examples out of

14  how many police reports did you see in the

15  California litigation?

16       A.      It -- I don't know the exact

17  number.

18       Q.      Was it more than three?

19       A.      Yes, it was more than three.

20       Q.      Was it more than 20?

21       A.      No, I don't -- it was less than

22  20.  But, also there, it was nothing that I can

23  remember that showed that a crime was submitted

24  with a gun.

25       Q.      So is your position that you don't

1

```
1

2    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
3    ------------------------------------------------x

     NATIONAL ASSOCIATION FOR THE
4    ADVANCEMENT OF COLORED PEOPLE,
     et al.,
5
                    Plaintiffs,      99 Civ. 3999 (JBW)
6                                    99 Civ. 7037 (JBW)
          -vs-
7
     AMERICAN ARMS, et al.,
8
                    Defendants.
9    ------------------------------------------------x

10

11

12       Videotaped Deposition of LARRY NELSON,

13    taken by Plantiff, on August 15, 2002 at 9:21

14    a.m. at the offices of RENZULLI, PISCIOTTI &

15    RENZULLI, 300 E. 42nd Street, New York, New

16    York, by and before Marc Brody, a Notary

17    Public and Certified Shorthand Reporter.

18

19

20

21

22          DAVID FELDMAN & ASSOCIATES (USA)

23           575 Madison Avenue, 10th Floor

24              New York, New York 10022

25       (212) 921-0771    Fax: (212) 921-0718
```

216

1                          LARRY NELSON

2        attempt to get information to either verify

3        or refute Senator Schummer's report?

4              A        No.

5                  MS. BARNES:  Nothing further, Mr.

6           Nelson.  Thank you.

7              A        Thank you.

8

9     CROSS EXAMINATION BY MR. RENZULLI:

10

11             Q        As to the discussion had on the

12        Schummer report, do you recall if anyone

13        from Browning sent a letter to Schummer's

14        office?

15             A        The whole thing is kind of

16        vague.  I know there was a newspaper

17        article.  But I know I talked to somebody,

18        but I don't remember who that was.  I made

19        some hand notes.  I know that.  But outside

20        of that, I don't.  I honestly don't know.

21             Q        Have you.  Do you have any

22        recollection in the popular press as to

23        whether Schummer and his office stated that

24        they had made a mistake that you were a

25        manufacturer and not a dealer and should

228

1                    LARRY NELSON

2    case, California or Boston.  Was Browning

3    was sued in those cases?

4        A    Yes.

5        Q    The Boston case is no longer,

6    right?

7        A    That is correct.

8        Q    In that case did you receive

9    documents or police reports concerning

10   Browning guns, sir?

11       A    Yes.

12       Q    Did you have an opportunity to

13   look through those police reports, sir?

14       A    Yes.

15       Q    And in those police reports

16   there were references to guns that were

17   traced, Browning guns.  Is that correct?

18       A    Yes.

19       Q    I understand some of these

20   traces or majority or large majority you

21   couldn't read the serial numbers?

22       A    Yes,  There was quite a few,

23   actually.

24       Q    The underlying data that you

25   reviewed in these police reports, let me

229

```
 1                        LARRY NELSON
 2      ask you, were all these guns involved in
 3      crimes?
 4            A       No.
 5            Q       Were all these guns crime guns?
 6            A       No.
 7            Q       Where did you get that
 8      information from?
 9            A       Well, a lot of them come by any
10      of -- in fact, one of them suggested that
11      one of the guns was actually in a police
12      station.  It was behind, it was an auto
13      five, behind a couch or something.
14                    There's a policeofficer shot and
15      discharged the gun as I recall and in one
16      instance and that was traced.  Guns that
17      were stolen.  Somebody left one in a sack in
18      a park or something.  There was a number
19      that were -- That had no affiliation or
20      association with Browning whatsoever.
21            Q       The criminal investigation
22      referred to at the top of the trace request
23      that you received could mean a criminal
24      investigation not associated with any
25      particular gun.  Is that correct?
```

230

1                    LARRY NELSON

2          A      Yes.

3          Q      That you got from the

4     underlying documentation, correct?

5          A      Yes.

6          Q      Not in numbers or a database or

7     a trace request form.  Is that correct?

8          A      Yes.

9          Q      Trace requests form doesn't

10    tell you why a gun is being traced, does

11    it?

12         A      No.  It doesn't.

13         Q      Isn't it true, sir, after 1995

14    and 1996 we have what's called

15    comprehensive tracing?

16         A      I understand that.

17         Q      Traces all guns?

18         A      Everything.

19         Q      In terms of handguns, does

20    Browning essentially sell all the product

21    that is made for it?

22         A      Yes.

23         Q      Would that be for the operative

24    period 1996 through 2000?

25         A      Yes.