UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
NAACP,

                Plaintiff,                        99 Civ 3999 (JBW)
                                                    99 Civ 7037 (JBW)

        -against-

AMERICAN ARMS, et al.
ACUSPORT CORP., et al.,

                Defendants.
-------------------------------------------------------X

FINDINGS OF FACT AND
CONCLUSIONS OF LAW
SUBMITTED
ON BEHALF OF PLAINTIFF

      Plaintiff National Association for the Advancement of Colored People (hereafter

"NAACP") respectfully submits these Findings of Fact and Conclusions of Law based on

evidence adduced during the trial of this case from March 31 through May 6, 2003.

*Introduction*

    Plaintiff presented evidence of the existence of a public nuisance in the form of

widespread access to illegal firearms that causes harm to the population at large in that it

endangers or injures the "property, health, safety or comfort of a considerable number of

persons." *Copart Industries Inc. v. Con. Edison Co.*, 41 N.Y. 2d 564, 568 (1977).   The

nuisance has a disproportionately greater impact on African American residents of the

City and State than on other parts of the population and affects certain areas of the City

and State more than others. The evidence presented at trial demonstrates that the nuisance

was caused, contributed to and maintained by each defendant in this action.   Finally, the

1

evidence demonstrated that the NAACP was specifically harmed by the nuisance in the loss of income, loss of membership, inability to carry out its functions in organizing communities and the necessity of spending program funds on gun violence prevention efforts instead of other programmatic endeavors.

## I.   A PUBLIC NUISANCE EXISTS IN NEW YORK

1.    Defendants did not contest the existence of a public nuisance of gun violence in the State of New York.  Defendants put on no evidence indicating: (1) that the widespread availability of illegal guns throughout the City and State did not exist, or (2) that the presence of illegal guns in the community was, in fact, not a public nuisance.

2.    Plaintiff presented to the advisory jury in this case extensive evidence of the nature of the public nuisance in New York and its disproportionate effect on one community – the African American community. Plaintiff's evidence of the public nuisance in New York came in primarily through former NYC Police Detective Bryan Dunigan, Professor Jeffrey Fagan and Dr. Howard Andrews.

3.    Testimony was presented by former Joint Firearm Task Force Detective Bryan Dunigan that New York strictly limits the people who may own handguns in the City of New York but that prohibited persons and those without the requisite New York license are easily able to obtain firearms illegally. (Dunigan Testimony, April 1, 2003, Transcript of Proceedings, hereafter "Tr." at 293-6):

Q:  Does New York City limit who can own handguns, Detective Dunigan?

A:  Yes.

Q:  Do you know what those requirements are?

A:  To own a gun, you first have to apply through the New York Police Department's pistol licensing section and meet certain criteria. You know, you

2

can't be a convicted felon. You can't have mental disease or defect. I think you can't have been dishonorably discharged from the Service.  There are a whole bunch of requirements, including your residency.

Q:  Do you need any kind of a permit or license to carry a firearm in New York City?

A:  Yes you do.  That's a particular type of license, you have licenses for target shooting, you have licenses that you can keep a gun in a particular premise or you can apply for a carry permit.

Q:  Are those strictly regulated, in your opinion

A: Yes.

Q: So would you say the number of people who are legally permitted to carry a firearm in New York City is pretty limited

A:  Oh yes.

Q: Are felons permitted to carry firearms in New York City?

A:  No

Q:  How about juveniles?

A:  No

Q:  In your experience, are felons able to get handguns in New York City without a license?

A:  It has been my experience that they have been able to, yes.

Q:  How about juveniles?

A: Yes

Q:  How do they obtain these firearms, in your experience?

A:  Most of them know someone in their particular neighborhood that's known as like the local guy you go to if you want to get your hands on a gun. It is not an uncommon occurrence.

* * *

Q: Would you say it is difficult for [felons] to obtain these handguns:

A:  No. I would say no, because of the frequency with which we encounter people selling guns.

Q:  Would you say that's true for juveniles as well?

A:  Yes.  There were several instances of minors being caught with guns.

4.     Detective Dunigan explained the firearm trafficking interdiction efforts of the NYPD – ATF Joint Firearm Task Force, indicating that most of the guns purchased undercover were "newer" and that many times the task force members bought "brand new guns, many of them even still in boxes with manuals, operation manuals and gun cleaning paraphernalia" (Tr. at 303-04; desirability of new guns for criminals: Tr. at 322). The illegal guns seized and investigated almost invariably did not come from retail sources in the City of New York but rather would come from out of state (Tr. at 305; 316: "in my experience almost all the guns that I came upon in my investigations originated from out of state").  Detective Dunigan also testified that though he recalled one instance of purchasing a gun that had been stolen, he found that very few of the guns he recovered were stolen (Tr. at 337).  Further, in addition to the testimony of Lucy Allen and Dr. Howard Andrews, concerning the out-of-state sources for illegal handguns recovered in new York, Detective Dunigan also testified that nearly all illegally purchased handguns originate from out-of-state (Tr. at 316).  Detective Dunigan also testified that despite prices that are often two to three times the price charged by legitimate FFLs (Tr. at 318), handguns can be obtained in the illegal market in New York City with a great deal of ease.  During his tenure with JFTF, Detective Dunigan could practically "place an order" (Tr. at 321) for a desired handgun.  He also testified that guns could be purchased with consecutive serial numbers (Tr. at 322). [Thereby, dispelling the notion advanced by defendants that every instance of a series of consecutive serial numbers appearing in the

4

trace database was the result only of law enforcement's efforts to trace a single handgun
with a single digit/letter of the serial number obliterated.]

     5.    Professor Jeffrey Fagan, a nationally recognized fellow of the American
Society of Criminology and faculty member of the Columbia University School of Law
and School of Public Health, presented evidence that the access to guns among young
people in New York is a substantial contributing cause of firearm homicides and injuries.
(Tr. at 3594-95).    The opinions Professor Fagan presented in court on two separate days
summarized his on-going research on the social contagion of violence and gun violence
generally and in New York City.  See generally, Jeffrey Fagan and Deanna Wilkinson,
GUNS YOUTH VIOLENCE AND SOCIAL IDENTITY, 24 *Crime & Justice*, 373-456 (1998);
Deanna Wilkinson and Jeffrey Fagan, "A Theory of Violent Events," in THE PROCESS
AND STRUCTURE OF CRIME, 9 *Advances in Criminological Theory* 59 (2001); Jeffrey
Fagan, Deanna Wilkinson, Garth Davies and Franklin Zimring, Social Contagion of
Youth Violence in New York, presented at a Seminar on Urban Health and Adolescents,
John F. Kennedy School of Government, Harvard University, May 2000,
**http://www.ksg.harvard.edu/juprp/Sitepages/UrbanSeminar/Violence/Papers/Fagan**
paper.pdf.

     6.    In testifying before the Court in this matter, Professor Fagan relied on
these independent, published and peer reviewed studies.  One, an epidemiological study
looks at the patterns of gun and non-gun violence, that is, "simply looking at the rates of
violence as they occur over time from one day to the next" (Tr. at 3560).  The other
involves interviews in which young men were "asked about the kind of situations where
gun violence takes place or where gun violence might have taken place or where they

decided not to engage in gun violence" (Id.).  Professor Fagan also obtained firearm trace data and added gun seizure (recovery) information to his analysis of the contagious effects of gun acquisition, gun injury and homicide among youth.

7.  For the epidemiological study of violence and gun violence in New York, Professor Fagan relied on New York City Department of Health (Vital Statistics and Injury) data for all persons whose deaths were classified as homicides by the Medical Examiner's Office and from the hospitalization records for persons admitted to the hospital because they were the victim of some kind of assault, which data were also maintained by the New York City Department of Health (Tr. at 3562-63).   Professor Fagan also relied on census data to take into account the demographics of the neighborhoods he was studying and in effect to control for the "social and economic well being of the neighborhood" including "poverty rates, type of housing people live in … employment rates and unemployment rates … age distribution of the population" (Tr. at 3580-81).  He used census data "in order to identify the characteristics of neighborhoods where people live so if we try and examine patterns of violence over time, gun violence or any other form of violence, we're able to take into account some of the factors about the neighborhoods which might be somehow contributing to the violent events that occurred" (Tr. at 3564).

8.  Examining simply the homicide and injury data for New York City, Professor Fagan demonstrated that the changes in the homicide rate between 1988 and 2000 were attributable to gun homicides (see Fagan Exhibits 6 and 7).   The number of homicides by means other than firearms steadily decreased, with some small exceptions, from the late 1970s onward and to the extent that there was "an epidemic of violence in

New York City both during the 1980s and a real sharp one in the [late] 1980s … we can see it was an epidemic of gun violence, not of just other kinds of violence" (Tr. at 3570). More, in analyzing the injury data, Professor Fagan stated that for the firearm injury data as well, "all of the increase and decline starting in 1990 was also attributed to gun violence" (Tr. at 3572 and Fagan Exhibit 8).

        9.     Through statistical analyses (Poisson regression model with repeated measures of autoregressive covariance, which statisticians use to measure clustered occurrences) that examined the events of violence and gun violence in a particular neighborhood with regard to the occurrence in adjacent neighborhoods of incidents of violence and gun violence, Professor Fagan provided evidence that incidents of gun violence spread "outward" to and "inward" from adjacent neighborhoods (Tr. at 3568-70) and that the risks of gun violence and its spread are  particularly and disproportionately felt in African American communities (Tr. at 3576-82).  His findings are presented in particular detail in Fagan Exhibit 9 and 10 and at pages of the transcript of April 28, 2003, at 3572- 3579.  From his research, Professor Fagan found the following patterns and drew certain conclusions:

> "We found definite evidence that homicides spread over time both outward and inward.  We found that gun homicides in particular are more likely to spread compared to non-gun homicides … [After controlling for population and racial characteristics in neighborhoods] [w]e found two things: One is that in neighborhoods with higher population of African Americans or persons of African descent that homicide spread was greater compared to neighborhoods with lower percentages of African Americans and that also African American individuals were more likely to be victims of a spreading process of gun assault compared to other people of other racial groups" (Tr. at 3480).

        10.     Professor Fagan also presented the results of a study based on interviews of young men aged 15 to 24 from two New York City neighborhoods, East New York

and the South Bronx.  The purpose of the study was to try and understand the "causal dynamics" or "why things happen, what happens on the ground.  In sort of a history of how social science knowledge builds up, this is called the context of explanation.  You are doing the study to explain what happened.  And, so, what we did was to start a second study in 1995, which focused on the events and circumstances of where gun violence took place. In other words, we were trying to get at those events we were modeling statistically in other … analyses we just looked at" (Tr. at 3582).

11.      In these interviews, Professor Fagan's team of carefully selected and trained interviewers asked a group of young men who had been involved in violent encounters a series of questions in a two hour interview that was designed to find out the reason these young men engaged in violent behavior and the purpose they believed it served.  The interviews were conducted by the subjects' peers, and the interviewers, who were trained for six months, were ex-offenders who could gain the trust of their subjects. (According to Professor Fagan, he and his team asked questions not commonly asked by criminologists, such as: "why did you do that.  Why did that happen? You tell me why did that happen.  We would listen to them talk about why they did that, what purpose [it served]. One of the questions we asked [was specifically that] what purpose did it serve? What did you get out of it?" (Tr. at 3587)). An analysis of their responses disclosed patterns.  Professor Fagan testified that he found that violence actually served a function in these lives.  "It wasn't just somebody acting out rage. It [had] a very very specific purpose" (Tr. at 3587-88).

12.      Guns, as Professor Fagan testified, played a central role in the ability of these young men to carry out violence.  The young interviewees described their perceived

need for a gun because of the dangerousness of the world they lived in.  And, the decisions that were made in a dispute or fight were "driven by their assumptions about whether or not the other guy had a gun and whether they had a gun and the events where they had a gun were very different, obviously, than the ones where they didn't have a gun" (Tr. at 3590).   The belief that the other person had a gun raised the stakes considerably: to guess wrong about whether the other person had a gun could result in being shot and killed.  "[S]o they often just simply cut right to the chase and just as soon as the dispute arose to a particular level they would pull out a gun and either threaten the person with it or shoot down at the ground at them or shoot at them" (Tr. at 3590).

13.     Taking the epidemiological data together with the information obtained from these interviews allowed Professor Fagan to make some inferences about the spread of gun violence:  "we saw some things that explained … the pattern of spread from one neighborhood to the next and from one person to the next" (Tr. at 3593). With respect to the proliferation of illegal guns and the nature of the harm it causes, Professor Fagan found as follows:

> We thought that guns had been internalized, became part of the way the kids thought about themselves.  It was part of the idea of adolescent development. When you were 13 you expected to be using a gun by the time you were 14, 15 or 16 and it would seem an inevitable right of passage the kids described to us.  We found the kids would look at other kids using guns and they would learn about how to use them, they would learn about the situations to use them.  They would in effect develop what we would call a behavioral script.
>
> \* \* \*
>
> We found that this fear, the kids talked about being afraid of the other person and having to act tough or violent, having to use a gun to ward off and threaten the other person, we found it was that fear that seemed to be the most contagious from one kid to the next" (Tr. at 3593-94).

14.     The subjects of Professor Fagan's research were also asked to provide the source of their guns, which included purchases from gun dealers operating in the neighborhood, people who sold guns out the backs of their cars, being given a gun by a family member, or occasionally theft from a family member or other criminal (Tr. at 4506).

15.     Professor Fagan also analyzed those portions relating to New York City neighborhoods of the firearms trace database maintained by BATF and provided to the experts in this action pursuant to the Order of the Court, *NAACP v. AcuSport, et al.* [210 F.R.D. 268 (E.D.N.Y. 2002)] in connection with his ongoing work on the social contagion of gun violence. In his view, the database "provides an independent source of information about where guns are located in particular communities," providing information on the concentration and density of guns in a community as having "some influence on the use of guns in gun homicide and gun injury rates in particular areas" (Tr. at 4477). Further, according to Professor Fagan, the database provided him with hitherto unavailable information on (1) "an estimate of the concentration of guns in a particular neighborhood"; and (2) an "estimate of the number of guns that were available to the criminal population" (Tr. at 4478).

16.     Having reviewed the testimony of defendants' statistical experts, Drs. Wecker and Mathiowetz, Professor Fagan declined to agree with their stated view of the trace database as "unreliable and inappropriate for any purpose" (Tr. at 4482). Clarifying their criticism of the database as unusable because it is not a random sample, Professor Fagan put the issue of random versus non-random into an appropriate scientific context:

Well, it is a non-random database. No one disputes that. Whether or

not the fact that it's not random doesn't mean that it is not important or useful in the kind of research we are asking for.

*   *   *

How you use the data and its reliability, whether or not it would produce similar results in the different research circumstances depends on the questions you are asking.

For the questions we asked, which is whether or not one is exposed to an illegal gun and whether or not that person has a likelihood of suffering a gun injury as a result of that, that is a very, very good database.  <u>In fact, it's probably the strongest database you can find for that very question</u>" (Tr. at 4483, emphasis added).

    17.    In performing his research using the firearms trace database, Professor

Fagan "simply asked and analyzed whether or not there was a correlation between the

gun seizures in the particular neighborhood and the rates of gun homicides and non fatal

gun injuries" (Tr. at 4484).  He found that there was a strong correlation and particularly

so for African Americans (Tr. at 4498).   The database provided Professor Fagan with the

best measure or the best evidence available on the question of the number of people

carrying guns in a neighborhood.  In performing his work, he assumed that the number of

recoveries of firearms ('seizures') was an approximation of the number of guns carried or

used in that area (Tr. at 4485-86).  His methodology included testing the reliability of the

data by subjecting it to different tests to see if the result was the same and he found that

his conclusions based on the database were fairly robust: "likely to obtain the same result

through lots of different testing conditions.  Based on poking and prodding the data in

this case, we thought that the trace data were about the best evidence we had and

reliable" (Tr. at 4487-88).   Using the trace database, Professor Fagan was able to

determine, over time, the extent to which gun seizures in a neighborhood either predicted

the spread of homicide outward from that neighborhood or the contraction of homicide,

11

and the extent to which those homicides migrated inward to the census track" (Tr. at 4490).  (See Fagan 42; see also Fagan 43 for an analysis of gun seizures as predictive of gun injuries by assault.)

18.    Professor Fagan testified that there is a strong correlation between the presence of illegal guns in a community and the number of gun homicides and non-fatal gun injuries (Tr. at 4498).

19.    This finding was corroborated by Mr. Joseph Vince, a former high level ATF official who headed the ATF Crime Gun Analysis Branch and testified based on his 30 years of experience in law enforcement and criminal firearms interdiction efforts.  On April 14, 2003, Mr. Vince testified as follows:

Q:  Based on your experience and your work at ATF, are you aware of the effect of crime guns in a particular community?

A:  Yes, very much so.

Q:  Could you describe very briefly what those effects are?

A:  Well, crime guns literally devastate communities economically as well as terrorize the people that live in those communities.

And what we have found is that is you can reduce the availability and accessibility of … guns to criminals in that community, you bring down violent crime.  That has been shown over various parts of the country [Tr. at 2309-10; see also testimony of Detective Dunigan, that availability of firearms is a contributor to crime in New York (Tr. at 347) and are a threat to police officers (Tr. at 290).]

20.    Professor Fagan also prepared maps, Fagan Exhibits 46 and 47 (Exhibit 46, "NYC Census Tracts Gun Homicide Rates and Gun Seizures 1996-2000"; Exhibit 47, "NYC Census Tracts African American Gun Homicide Rates and Gun Seizures 1996-2000") which demonstrate how New Yorkers in certain neighborhoods are exposed to guns as a toxic substance, like a contagious bacterium or virus.  His analysis shows that

"the exposure leads to injury if not death and controlling that exposure is an extremely [efficient] way to control the spread of gun homicides" (Tr. at 4499).  Exhibits 46 and 47 demonstrate that where there are gun seizures, there are gun homicides and that "predominantly, this is a problem that affects African Americans" (Tr. at 4502). Moreover, while Professor Fagan acknowledged that the areas depicted on Fagan 46 and 47 (maps) of gun seizures and gun homicides largely correspond to neighborhoods of poverty and measures of poverty and social disadvantage, contrary to the assertions of defendants' expert Dr. Gary Kleck, there is "far less evidence however, that given that poverty and homicide that a reduction in the poverty will lead to a reduction in homicide" (Tr. at 4507).  Moreover, as he reported more than once, Professor Fagan controlled for poverty and other measures of social disadvantage in reaching his conclusions about the contagious effects of illegal guns in a community.

21.    There is an enormous racial disparity in the rate of firearm homicides between African Americans and whites that is consistent over time and is not affected by the absolute level of the firearm homicide rate (testimony of Howard Andrews, Tr. at 2663).  Nationally, African American males in the age groups 15-24 are approximately 10 times more likely to be the victim of firearm homicide than their white counterparts. In New York City, the rate is about 120 firearm related deaths per 100,000 young African American males, compared to only 10 per 100,000 white males (Tr. 2650 – 2663).  Dr. Howard Andrews, of Columbia University's School of Public Health, relied on the annual reports of causes of death categorized by race, age and gender published by compilation of data on the Centers for Disease Control (CDC) and on statistical data published by the New York City Department of Health, Violence Division which reports

13

the number of homicides and violent crimes involving guns by age, gender and race.  His findings were summarized in Andrews 14, in evidence.

22.     Briefly, those findings were as follows:  for the twenty (20) year period from 1978 to 1998 there were 290,670 firearm homicides in the United States.  Eighty percent (80%) of those involved a handgun (Tr. at 2653).  Despite the fact that blacks are a distinct minority in this country (accounting for only 12% of the population), there were more homicide deaths of African Americans than there were of whites: 142,819 firearm deaths of African Americans and 141,456 deaths of whites.   Dr. Andrews also found that firearm homicide is the leading cause of death for young African American men in the age groups 15-19 and 20-24.  Firearm homicide is the fifth leading cause of death for whites in those age groups.    In Andrews 15, Dr. Andrews demonstrates graphically the rate of firearm death by race for men by age group.  "It's a pretty clear cut pattern.  In every single age group, even going up to 85 and over, African Americans are more likely to die by firearm homicide than are whites. But the most striking thing is what's happening among young people.  Fifteen to 19, 20 to 24, 25 to 34, 35 to 44, there is a huge racial disparity" (Tr. at 2658).   The un-controverted national statistics show that "African American men in the 20 to 24 age range are more than ten times as likely as whites in that range to die by firearm homicide" (Tr. at 2658).

23.     The same racial disparity between whites and blacks exist in New York City where there is a 'strikingly constant' finding over the years that African American males age 15 to 24 are more than 10 times more likely to be killed with a firearm than whites of the same age.  (Tr. at 2660), see also Andrews 16, in evidence.  Moreover,  Dr. Andrews found that the racial disparity seems to be independent of the magnitude of the

overall homicide rate.  "Despite whether you have high homicide rates or low homicide

rates, this ten-to-one factor for young males, black versus white, appears to hold up." (Tr.

at 2661-62).

24.    There are approximately two non-fatal firearm injuries for every one

homicide nationally and in New York and that the same racial disparity of about 10:1

African American to white applies to firearm injuries as well (Tr. at 2662-63).

25.    Under New York State common law, "A public nuisance exists for

conduct that amounts to a substantial interference with the exercise of a common right of

the public, thereby offending public morals, interfering with the use by the public of a

public place or endangering or injuring the property, health, safety or comfort of a

considerable number of persons."  *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia*

*Center, Inc.*, 96 N.Y.2d 280, 288 (2001).  This Court has already recognized that the

relevant injury here is "widespread criminal access to firearms." *NAACP v. Acusport*

*Corp.*, 210 F.R.D. 446, 459 (E.D.N.Y. 2002).  Moreover New York law already

recognizes that the underground market for illegal handguns constitutes a public

nuisance.  *See* N.Y. Penal Law § 400.5(1) (declaring that "[a]ny weapon … when

unlawfully possessed, manufactured, transported or disposed of, or when utilized in the

commission of an offense, is hereby declared a nuisance" and referring to the list of

weapons contained in Section 265.00 of the Penal Law).

26.    Plaintiff's factual evidence of the existence of the public nuisance in New

York, its nature and extent was fully supported by reliable evidence from experts with

particular knowledge in their respective fields, pursuant to Rule 702 and 703.  Plaintiff

has submitted ample credible evidence that there is a public nuisance of widespread

illegal firearm availability in the State of New York, and that this nuisance causes harm to persons in New York in general and specific harm to the African American population of this State.  See *Copart Industries Inc. v. Con. Edison Co.*, 41 N.Y. 2d 564, 568 (1977).

## II. DEFENDANT MANUFACTURERS AND DISTRIBUTORS CAUSE AND CONTRIBUTE TO THE PUBLIC NUISANCE OF THE PROLIFERATION OF ILLEGAL GUNS IN NEW YORK

27.    Plaintiff's experts provided evidence of the industry-wide connection between the legal market and the illicit market that constitutes the public nuisance nationally and in this state and the means of diversion from the legal to the illegal markets.  Plaintiff's experts also presented evidence from a variety of sources that each of the manufacturers and distributors in this case caused and contributed to the proliferation of illegal guns. [See ¶s 62-129, infra].

28.    The Bureau of Alcohol Tobacco and Firearms ("BATF") is charged with regulating the firearms industry.  Defendants contended through deposition testimony by Rule 30(b)(6) witnesses that BATF has sole responsibility for insuring that guns are not acquired and possess by prohibited persons.  The testimony from former BATF witnesses offered by plaintiff was to the contrary.

29.    See also testimony of Robert Ricker on April 7, 2003: "The countervailing view [within the industry to the proactive position regarding firearms diversion] as expressed to me was that any of the violations were merely technical violations and that if there were actual criminal conduct that was taking place at the dealer level, that that was the job of ATF to deal with exclusively" (Tr. at 1300-01).

30.    Plaintiff offered the testimony of three retired high ranking administrators of the Bureau of Alcohol, Tobacco and Firearms (hereafter "BATF" or "ATF"), Steven

Higgins, former Director, Joseph Vince, former Special Agent in Charge of the National

Tracing Center and Crime Gun Analysis Unit, and Gerald Nunziato, also a former head

of the Tracing Center, about BATF's inability adequately to regulate firearms

transactions.  BATF is charged with regulatory responsibility for firearms under 18

U.S.C. § 921, et seq.  Plaintiff's witnesses testified and presented documents describing

BATF's inability to adequately regulate the gun industry, particularly the retail dealers

which, evidence from ATF publications and testimony of witnesses concluded are a

primary conduit of guns from the legal to the illegal market (Vince Testimony, April 14,

2003, Tr. at 2269-70, 2281; Plt. LT 1 Following the Gun at p. 4; Plt. LT 63 Northeastern

Study; Ricker Testimony, Tr. at 1255-56).  The ATF experts, as well as Robert Ricker,

described a severely under-funded, ham-strung agency that is limited in its ability to

prevent diversion of firearms to the illegal market (Tr. at 548 et seq.) and is forced to

'purge' important records at the request of a vocal gun consumer organization (Nunziato

Testimony, April 3, 2003, Tr. at 935).  Moreover, the BATF is incapable of inspecting all

but a tiny percentage of dealers (Commerce in Firearms 2000, Plt. LT 3 at C.4.2; Higgins

Testimony, Tr. at 548-551, 557-560), is restricted to one compliance inspection per year

(Higgins Testimony, April 1, 2003, Tr. at 478) and cannot close down dealers even after

notice of revocation,  indictment and even conviction. (Higgins Testimony, Tr. at 477:

"In my opinion, one of the weaknesses of the statute was that it allowed dealers to stay in

business, continue to receive and sell firearms, all the way through the de novo review

process.  So [the retail dealer] could continue to operate for what – many cases took six to

ten years to finally complete", and Tr. at 478, explanation of the process of trying to close

down a dealer where violations had been noted, year after year.)   See also, Higgins on

dearth of firearm prosecutions under 18 U.S.C. § 921 generally and the almost non-existent number of prosecutions of dealers or traffickers (Tr. at 628-29). See also Plt. LT 5 Bureau of Justice Statistics "Firearms Offenders 1992-1998."

31.    The lack of any meaningful regulatory or enforcement authority by ATF has lead to flagrant violations of responsible business practices by virtually every member of the industry. Evidence adduced at trial by plaintiff demonstrated that gun makers and distributors routinely take advantage of ATF's lack of regulatory and enforcement authority to increase their sales. Each of plaintiff's ATF witnesses, as well as Professor Gundlach and Robert Ricker described the mechanisms by which defendant gun makers and distributors circumvent the intent of the law – if not the letter of the law – to maximize the number of sales to any financially viable outlet. Defendants willfully violated of the spirit of the federal and state laws designed to restrict gun acquisition and possession by refusing to use the information provided to them on a daily basis to police their own distribution chains and by doing so ensure that persons not authorized to acquire firearms do not do so, which may involve cutting off dealers who had been indicted and/or reviewing trace requests to determine which dealers were responsible for traces, and which guns were involved in more traces than others.

32.    Robert Ricker testified extensively about what the industry knows about the diversion of firearms from the legal to the illegal market and how guns are diverted. Mr. Ricker's opinions were based on his years of experience as a National Rifle Association (hereafter "NRA") executive and a high official of one the principal gun industry trade associations, his participation in innumerable industry-wide planning and strategy meetings and his work with all branches of the industry: manufacturers,

distributors and dealers.  Mr. Ricker was clear and emphatic that the industry knows that crime gun traces are indicators of problems at the dealer level and are notice to all up-stream distribution partners of these problems (Tr. at 1290).  He testified that traffickers often report guns stolen to throw off a trace (Tr. at 1293), thus covering their participation and inflating the number of guns reported stolen.  He also stated more than once that the reason industry members gave for not addressing the clear dangers posed by un-supervised dealers causing widespread harm to communities was as follows:  "Well the objection was very simple.  It was that if the industry took voluntary action, it would be admitting responsibility" (Tr. at 1269).  And, later in his testimony, he stated:  "Again, the concept that if you are proactive and take steps to remedy the problem, then you have recognized that you are responsible partially for the problem" (Tr. at 1301).

33.    The evidence presented on the firearm tracing process primarily by Gerald Nunziato, Joseph Vince and the statistical experts, Lucy Allen and Howard Andrews, demonstrated without question that 1) the guns in the trace database are overwhelmingly crime guns (that is 'recovered in connection with a crime');  2) information in the trace database has been made available to defendants and would have been made more extensively available to any that sought information; 3) that trace information provides to each manufacturer, distributor and dealer – with some technical assistance – an abundance of information that could be used to police their distribution system.

34.    According to Dr. Andrews, the firearms trace database maintained by BATF is an electronic database that contains approximately 1.2 million traces or records of the title or ownership history of guns recovered in connection with a crime (Andrews Testimony, Tr. at 2577-81).  The database provided to the experts in this case covers the

period 1989 through December 31, 2000.  It is organized in an Oracle database, with separate tables containing different fields of information regarding traced guns: including information about the gun, the caliber, the serial number, the place of recovery, and all the commercial entities that sold the gun from manufacturer to dealer (Tr. at 2580-90).

35.   In a straightforward way, Dr. Andrews' analysis presented un-rebutted evidence of the sources of guns recovered in crime in New York State and New York City both in terms of where the guns recovered in crimes in New York were last sold at retail and which manufacturers, distributors and dealers sold those guns (Tr. at 2602). His geographic and defendant-specific analyses of the sources of crime guns are consistent with other published analyses performed on the trace database (Tr. at 2647).

36.   Dr. Andrews' geographic analysis demonstrates the flow of those guns that leave the states where they were last sold at retail.  Across the database, two thirds of guns sold at retail were recovered in the state in which they were last sold at retail. They do not move, are not exported or trafficked, as it were (Tr. at 2606).  And looking at the data from a national perspective, Dr. Andrews found that there was "huge variability between states" in the number of crime guns originating out of state.  Stated differently, Dr. Andrews did not find that one-third of the guns recovered in crime in every state come from out of state (Tr. at 2607-08).  Rather, there are states like Alaska in which only 24% of crime guns came from out of state and states like New York and New Jersey where 85 and 80 percent respectively of the crime guns recovered in these states were last sold at retail out of state.  Dr. Andrews stated:  "So, New York and New Jersey are just real standouts … New York and New Jersey are markedly different from any other state in terms of the extent to which guns used in crimes in those states come from outside,

from another state" (Tr. at 2608). The source states for New York in order of magnitude are Virginia, Florida, Georgia, North Carolina and South Carolina (Tr. at 2611-12 and 2615; see also Andrews Exhibit 20).   Ms. Allen supplemented the straight geographic analysis by Dr. Andrews by demonstrating that the source states are weak law jurisdictions (Allen Testimony, April 22, 2003, Tr. at 2983 et seq.).

37.    Dr. Andrews also presented evidence from the firearms trace database showing that each of the defendant manufacturers and distributors was a source of guns recovered in crime in New York City and New York State.   Dr. Andrews constructed tables that are in evidence in which he showed the numbers of guns made by each defendant manufacturer recovered in connection with a crime in the City and State of New York, and the number of guns which had been sold by one of the defendant distributors which were similarly recovered in connection with a crime here.  See Andrews Exhibits 21-23 and 25 and Tr. 2617 et seq.)  The figures presented in these exhibits alone sufficiently demonstrate the defendants' participation in the creation of the nuisance of widespread proliferation of illegal guns.

38.    Ms. Lucy Allen, an economist from the National Economic Research Associates (NERA), made several general findings regarding the size of the market of crime guns, the number and percentage of guns overall going into criminal hands and the speed with which they do so. Ms. Allen also performed an extensive defendant specific analysis of each defendant's crime gun ratio, that is, the percentage of crime guns sold compared to the overall number of guns produced and/or sold and an analysis of each defendant's relationship with the dealer outlets with 'problematic' sales practices attributable to crime gun sales.

39.   First, Ms. Allen found generally that criminals are an important market segment for the gun industry as a whole (April 22, 2003, Tr. at 2961, and Allen Exhibit 109, in evidence entitled "Violent Criminals Constitute Important Users of Handguns"), constituting almost 15% of sales and the third largest market segment after "personal protection" and "target shooting."   Ms. Allen demonstrated that 11% of handguns sold between 1996 and 2000 were used in violent crimes by the year 2000 (Tr. 2971 and Allen Exhibit 105).  Ms. Allen also demonstrated that 18% of handguns sold in the year 1990 were in the hands of violent criminals or used in violent crimes by the year 2000 (Tr. 2971-2 and Allen Exhibit 106)   These percentages are not problem rates, like the rates of misuse of a product, these percentages of 11 and 18% are market segments (Tr. at 2974). In performing this analysis, Ms. Allen relied on public data (the FBI Unified Crime Reports and the Department of Justice, Bureau of Justice Statistics) to provide the number of violent crimes committed each year with a handgun and found that on average there were over 600,000 incidents of violent crimes – rape, robbery, assault and homicide – with handguns each year (Tr. at 2966); the trace database to determine the percentage of guns recovered in crime in one year that were sold in a prior year (for example, guns recovered in 1997 that were sold in 1996 (Tr. at 2969)) and on a published survey of prison inmates to estimate the number of violent crimes were committed per handgun owned (Tr. at 2970).

40.   From her analysis of the firearms trace database, Ms. Allen found that guns move quickly from the legal to the illegal market (Tr. at 2978 and Allen Exhibit 1). Ms. Allen looked at the distribution of handguns recovered in the trace database and found that 13% were recovered within one year of their sale and 30% were recovered

within 3 years of their sale (Id.).  As she explained, three years is considered by BATF to be a useful trafficking indicator (Tr. at 2978). Ms. Allen's analysis took into account the arguments by defense counsel and others that there is an age bias in the trace database because it is harder to trace older guns and that older guns are not submitted for tracing. Ms. Allen found both propositions unfounded and much of the analysis performed throughout her work dealt specifically and exclusively with young guns, that is, guns recovered within three years of their sale (Tr. at 2979-82).

41.   Ms. Allen also found that "a large percentage of handguns recovered are recovered out of the state in which they were purchased" (Tr. at 2983).  Ms. Allen also found that the percentage of recovered guns purchased out of state was not the same in every state, but varied by the strength of a state's gun laws. So that, "in states with stronger gun laws, like New York, that higher percentages were actually purchased in another state.  We found in weaker gun law states, that it is smaller.  So much larger percentages of guns purchased out of state when you are in a strong law state, like New York."  (This finding is consistent with Dr. Andrews' findings that a large and variable percentage of recovered guns were last sold at retail in another state. Andrews testimony, April 21, 2003, at 2602-06).  Thus, Ms. Allen found that the majority of guns purchased out of state were purchased in a state that had weaker gun laws  (Tr. 2984-85).  Ms. Allen tested the relationship between the severity of state laws and the flow of crime guns and found that "the difference in the severity of the state's law was statistically significant in predicting the flow of guns, even if you control for the population of the state … and how far apart in miles the states are"  (Tr. at 2986).  Based on this analysis, Ms. Allen found that criminals are using the outlets of the gun industry to get around the state laws (Tr. at

2985).  This is especially true in New York (see Andrews analysis described supra at ¶ 36).

42.     In a companion analysis of gun flows between states, Ms. Allen found that guns move from states that are oversupplied relative to indicators of legitimate demand. (Tr. at 2987).  That analysis examined measures of legitimate demand (from a survey commissioned by defendant Smith & Wesson and from the national General Social Sciences Survey, or "GSS"), retail sales at the state level and crime gun data from the trace database (Tr. at 2989).  Ms. Allen found that "in states where the relative oversupply was bigger, there were more crime handguns being purchased in that state and going to other states.  We found a statistically significant relationship between the level of relative oversupply in a state and the number of handguns being purchased in that state and used in crime in other states" (Tr. at 2990).  Again, the evidence demonstrates that gun industry outlets have been used to facilitate the dispersion of crime guns for use in states with controlled sales.

43.     Two other analyses discussed by Ms. Allen demonstrated the overall relationship between the gun industry as a whole and the public nuisance of widespread criminal acquisition of illegal guns with resultant injury and death.  The first involved an analysis of data from a pre- and post-1993 multiple sale handgun ban instituted in Virginia.  The research study, which was published in the *Journal of the American Medical Association* (JAMA), disclosed that as a result of restrictions on multiple sales, the percentage of crime guns purchased in Virginia and recovered throughout the Northeast fell dramatically (Tr. at 3005).  In addition, Ms. Allen analyzed the decrease in the number of federal firearms licensees (FFLs) occasioned by changes in the law

instituted in 1994 in relation to the decrease in firearm homicides and found that there was a statistically significant relationship between reductions in the number of dealers and the decline in homicides in other states (Tr. at 3007). Specifically, Ms. Allen "looked at what happened to the traces from the dealers that went out of business in Georgia, where did those crime guns go to?  We looked at the states where those crime guns flowed to and we found that the decline in homicides in the states where the crime guns are flowing was significantly related to the number of guns that were coming from those dealers that went out of business" (Tr. at 3007). She found that control at the dealer level statistically significantly explains the decline in homicides. Specifically, she found that "if these dealers had remained in business there would have been an additional 1,500 homicides in 2000, handgun homicides" (Tr. at 3008; 3098).

44.  Ms. Allen found that a small number of dealers were responsible for most of the guns going to criminals.  This finding was consistent with Dr. Andrews' analysis and the evidence presented by several ATF witnesses (Vince, Nunziato, Operation Snapshot, Commerce in Firearms 2000). Specifically, she found that 14% of dealers were responsible for all of the handgun traces for the period 1995–2000 and 86% of dealers had no traces during that time period (Tr. at 3011).  In addition, Ms. Allen found that only 7% of dealers were responsible for all young handgun traces (that is traces of guns recovered within 3 years of their retail sale) (Tr. at 3011).  Further, Ms. Allen found that the 1000 dealers with the most traces in 1995 accounted for 33% of the traces in 1995. The same 1000 dealers accounted for 27% of the traces in 2000 (Tr. at 3012).

45.  Ms. Allen looked at the sales and/or production information for each defendant manufacturer and distributor (Allen Testimony, April 23, 2003, Tr. at 3050-51,

3057; Tr. at 3073-79). The purpose of looking at the sales data in relation to the crime

gun data from ATF was to look at the crime gun ratio for each company.   Ratios, rather

than simple counts of guns, address the fact that certain manufacturers make more guns

and thus may have more crime guns and certain distributors sell more guns.  Ms. Allen's

analysis was designed to take into account those differences in production and sale and to

see if there are differences in the ratios of crime guns to guns sold and what is causing

those differences (Tr. at 3058 – 59). These ratios or percentages of crime guns to total

sales are presented in numerical terms in Ms. Allen's report, admitted into evidence as

Allen Tables 24B and 25B.  In interpreting the ratios of the various defendants, Ms. Allen

explained that a ratio of "1" is not necessarily a "good" thing.  It simply means that "if

everyone was 1, all the manufacturers would be the same, and all of them would be

having 11 percent of their guns going to criminals.  One is not a magic number.  It

doesn't mean that you're good if you're below 1 … the higher the number the worse your

ratio" (Tr. at 3060-61).

> 46.     Having found differences in the crime ratios of the manufacturers and

distributors, Ms. Allen then examined the practices of the defendants to determine which

if any were statistically related to crime ratios.   She testified that she and her researchers

found that manufacturers that do more of the following practices have smaller crime gun

ratios:  requiring evidence of a storefront, having an authorized dealer program,

maintaining records of sales to individual dealers, visiting dealers frequently,

commissioning market studies, maintaining distributor agreements, imposing controls

over how the product is advertised and inquiring about inventory level of distributors

(Tr. at 3085-98).  The kinds of practices Ms. Allen testified she found statistically

significant are relatively minor in terms of practices designed to limit diversion of guns from the legal to the illegal market.  However, what Ms. Allen examined was a relative measure designed to look at differences among a group of participants in an industry and after her examination, she found "that control of the distribution and marketing makes a difference to your outcomes" (Tr. at 3093).

47.    Guns leave the legal market principally at the dealer level.  See ¶ 26 infra. As with the manufacturers and distributors, size alone may result in more crime guns. Ms. Allen performed an analysis of the dealers relying on information from the trace database, the dealer sales data from Heckler & Koch and Beretta U.S.A. and a dealer survey NERA commissioned. (This was necessitated by the fact that there are no publicly available sales data for dealers.  Plaintiff's experts "just couldn't get information on how big these dealers are" (Tr. at 3101).)  This analysis is designed to answer the question, what makes a difference other than size in the number of guns sold by that dealer that go to criminals?  Ms. Allen testified about the process she and her team of researchers employed in analyzing what "indicators" other than size predicted or indicated that a particular dealer's guns would go into the hands of criminals (Tr. at 3101).  The dealer indicators related to crime gun flows are: (1) Out of State traces; (2) Obliterated Serial Number Traces; (3) Multiple Traces for the Same Purchaser; (4) Multiple Traces for Same Purchaser at Same Dealer; (4) Multiple Sales Form; (5) Traces from Multiple Sales Form Guns; (6) Record Keeping Problems; (7) Multiple Licenses at Same Location; (8) Bypassed Closer Dealer" (Allen Exhibit 15).  Ms. Allen extensively explained each of the indicators and their relationship to crime gun flows (Tr. at 3101-3176).  In discussing her work with regard to the dealer's indicators in Exhibit 15, Ms. Allen testified as follows:

We analyzed these [indicators] to see if they had an effect on the chance that a sale becomes a crime gun.  We did this three different times, once for the Heckler & Koch data.  We did a second analysis for Beretta [data], the third analysis using only the survey data . . . For example, we looked at out of state traces for Heckler & Koch. We said does the fact that a dealer had traces that were out of state [, meaning] that they were recovered out of state in 1996 through 1998 have a significant effect on the likelihood or the ratio of that dealer's traces and sales? So, it's the probability a sale becomes a trace in '99 and 2000.

So, each of these were a separate statistical analysis, a regression analysis we ran, and what the stars mean here is that we found that relationship to be statistically significant.   . . .  So dealers that Heckler & Koch sold to that had out-of-state traces in '96 through '98 had, on average, a higher ratio of traces (that is "crime guns") to sales (Tr. at 3126-27).

Ms. Allen indicated statistical significance at the 95% level with two stars on Exhibit 15 (Tr. at 3127-28).

48.   After determining which indicators are problematic, Ms. Allen determined which defendants – manufacturers and distributors – sold guns to the dealers that had the highest percentage of traces that met that indicator (Tr. at 3176).   More specifically, looking at the 'bypassed closer dealer indicator' in Allen Exhibit 29, Ms. Allen testified that "we looked at the 500 dealers that had the highest percentage of . . . traces where somebody bypass[ed] a closer dealer."  Ms. Allen further elaborated, "For each indicator separately, we came up with a group of 500 dealers that had the highest percentage of traces that met that criteria" (Tr. at 3178).  See also Plaintiff's Allen Exhibit 29A and B (for manufacturers) and Allen Exhibit 29C and D (for distributors).

49.   Ms. Allen found that the guns made by each manufacturer defendant and the guns sold by each distributor and importer defendant – with a few exceptions – were sold to dealers in the most problematic dealer group for each problem dealer indicator. Allen Exhibits 29A-D demonstrate sales by a defendant to one of the top problem dealers based on trace information (Tr. at 3181: "in general, we don't know how many guns are

28

sold to a dealer, but one piece of information that we have that guns were sold by a dealer is that a gun was recovered and traced and identified as being sold by that dealer.")  This evidence was specifically required by the N.Y. State Court of Appeals in *Hamilton v. Beretta*, 96 N.Y.2d 222, 238, 727 N.Y.S.2d 7 750 N.E.2d 1055 (2001). "[T]he negligent entrustment doctrine might well support the extension of a duty to manufacturers to avoid selling to certain distributors in circumstances where the manufacturer knows or has reason to know those distributors are engaging in substantial sales of guns into the gun-trafficking market on a consistent basis."

50.     Finally, Ms. Allen identified the dealers that are in each of the problem dealer groups.  See Allen Exhibit 30 (Tr. at 3189).   This Exhibit contains the names of 1559 dealers that are part of the one or more of the eight problem dealer groups.  As Ms. Allen testified, the first one, A One Jewelry [in Hephzibah, Georgia]

> was in each of the eight problem dealer groups.  That dealer was one of the top 500 dealers in terms of the highest percentage of out of state traces.  It was in the top 500 dealer group in terms of the highest percentage of young gun traces.  It was in the top 500 dealer group in terms of having the highest percentage of traces where there was the same person buying multiple guns which were recovered in crime.  It was in the top 500 dealer group in terms of having the highest percentage of multiple sales.  It was in the top 500 dealer group in terms of having the highest percentage of obliterated serial number traces.  It was in the top 500 group in terms of having the highest percentage of closer dealer or bypassing another dealer traces and it was dealer where there's another FFL at the same location (Tr. at 3189-90).

The second dealer listed is Ace Pawn Shop in Columbus, Georgia, the third is Twin Motors of West Point, Columbus, Mississippi, the fourth is Greg Driggers in Hephzibah, Georgia, then Trygue Strand in Sun Prairie, Wisconsin, and Oscaar Kiesylis in St. Petersburg, Florida (Tr. at 3190-91 and Exhibit 30, page 1).  It is interesting to note that of the first 25 entities listed not one sounds as if it has anything to do with firearms.

There are a number of pawn shops and individuals represented on first page of the list, as well as entities that appear to deal with automobiles: Twin Motors of West Point (#3) and Reliable Auto Parts and Services, Inc. (#15).

51.     Plaintiff's expert Gregory Gundlach, a professor of marketing at the Mendoza School of Business at the University of Notre Dame, assessed "how marketers in [the gun] industry supply their products to legitimate customers and take steps to countermarket against prohibited customers" (Tr. at 1458). Relying on standard and accepted principles of marketing that were unrebutted by any expert proffered by defendants,  Professor Gundlach offered extensive testimony about the practices of each individual defendant manufacturer and distributor he found by an exhaustive analysis of documents, litigation submissions and testimony from the defendants (Tr. at 1456-57). His conclusion was that no defendant took steps to prevent its products from being diverted to prohibited persons (Tr. at 1679-80).

52.     Professor Gundlach holds a Ph.D. in marketing as well as a J.D. (Testimony of Gregory Gundlach, April 8, 2003, Tr. at 1431).  Professor Gundlach explained that marketing is "management of the supply of [the economy's] products and services and their demand on the part of consumers" (Tr. at 1436; see also Tr. at 1447 – 1456, offering a general description of the marketer's role in facilitating the delivery of products and services to the consumers).  Prof. Gundlach continued, that "so much of marketing … involves converting, stimulating, or developing demand on the part of consumers, or to provide them with the goods and services they desire" (Tr. at 1437). One function of marketing, however, in certain situations, is actually to decrease demand or "de-market" (Tr. at 1438). According to Prof. Gundlach, marketers are "involved in

the process of attempting to help in a sense de-market or limit demand in a way that is beneficial to society overall" (Tr. at 1438).  As Prof. Gundlach explained, not all demand is wholesome: "there are customers and segments of our population that from a marketing standpoint and a societal standpoint it's been determined that these individuals should not consume a particular product, <u>and the marketer's task in these circumstances is to counter-market, in other words, to attempt to stifle or discourage or even cut off demand to those particular consumer populations</u>" (Tr. at 1438, emphasis added).

53.     Some examples of counter marketing include programs sponsored by the alcohol industry to encourage responsible service of alcohol, Training in Intervention Procedures (TIPS) and Being an Alcohol Responsible Server (BARS), Winners Drink Safely Campaign and the Techniques for Effective Alcohol Management Coalition (TEAM) (Tr. at 1442-43); programs sponsored by the tobacco industry designed to discourage underage purchases include the "We Card Program."

54.     Professor Gundlach's extensively described methodology conformed to standard and accepted analyses within the field of marketing (Tr. at 1462-64, et seq.).

55.     Relying on BATF publications and other academic and industry sources, Professor Gundlach extensively analyzed the means by which prohibited persons obtain firearms from the primary and secondary market, for instance from gun shows,  through straw purchasers,  theft and corrupt dealers.  These publications were also analyzed by Professor Gundlach in the sense that they provided notice to the gun industry members of the methods by which guns were unlawfully acquired for use by prohibited persons, or 'diverted' from the legal to the illegal market (see also Nunziato and Vince; Tr. at 1470). (Prof. Gundlach testified from Plaintiff's LT 8 in Evidence, <u>Crime Gun Reports</u>, 2000,

which indicated that "The crime gun trace reports have three audiences.  … They inform federally licensed firearm dealers of crime gun patterns allowing them to build sounder and safer businesses" Tr. at 1471; LT 116 "Gun Dealer Licensing and Illegal Gun Trafficking," BATF 1997; and Tr. at 1476)  From the industry, Professor Gundlach found an editorial by Robert  Lockett, a gun dealer in California, which describes how prohibited consumers get guns from legitimate market outlets (Tr. at 1473).

56.    As part of his analysis, Professor Gundlach testified that he examined the extent to which each defendant was aware of the various forms of diversion of firearms from the legal to the illegal market (Exhibits 2230 and 2231; Tr. at 1480-1483). Professor Gundlach examined the evidence in the form of interrogatory responses, documents provided as part of discovery,  depositions and  trace requests  to determine whether the evidence indicates that a particular defendant (manufacturer or distributor) is aware of or has knowledge of the different forms of diversion of guns from the legitimate to the illegal market.  He found that all manufacturer defendants had such awareness or knowledge (Tr. at 1480) and that all distributor defendants likewise had such knowledge and awareness (Tr. at 1482).

57.    Professor Gundlach also analyzed each defendant's ability to implement and control the distribution of its products or 'infrastructure': "the basic foundations for encouraging and stimulating demand" (Tr. 1511-12).   Professor Gundlach specifically looked at "whether or not [each defendant had] a distribution system"; "whether or not they manage the relationships within that distribution … whether or not they disseminate information in that distribution system and whether or not they also govern the

relationships in that distribution system"; and, " whether or not they implement control overall across that process" (Tr. at 1512 -14 and Exhibits 2240 and 2241).

58.     Professor Gundlach also examined the countermarketing or self policing strategies employed by each of the manufacturer and distributor defendants.  He testified that "[t]he last thing we did was to focus on the prohibited customers and the steps taken by member defendants in this case in terms of the countermarketing strategies that they employed" (Tr. at 1515 and Exhibits 2243 and 2244). Professor Gundlach further elaborated on his point later in his testimony when he made clear that his analysis of the distribution infrastructure employed by each defendant could be used – but was not – to limit the access of prohibited persons to firearms throughout the distribution chain:

> The nature of countermarketing strategies, it is important, I think to point out that what we are talking about here is taking areas of the distribution management infrastructure,  just as we have been talking about earlier today; and to engage in countermarketing strategies, you are going to draw upon the same areas, the same infrastructure, but you are going to use that infrastructure now, not to gain the patronage and not to encourage demand on the part of legitimate customers, but you are going to use those types of strategies as a basis for countering the demand on the part of the prohibited markets,  those prohibited customers.
>
> It is important to note that it is the infrastructure that you originally relied upon for your legitimate markets but you are now going to rely upon that as a basis for curtailing, cutting off, stifling, demand to your prohibited customers.
>
> So, it is the same systems, now just being used in a slightly different fashion (Tr. at 1517).

As discussed by the ATF witnesses,  the government has already stressed the importance of the gun industry itself engaging in self-policing or as Prof. Gundlach would say, 'countermarketing':  "The firearm industry can make a significant contribution to public safety by adopting measures to police its own distribution chain.  … In many industries, such as the fertilizer and explosives industries, manufacturers impose extensive controls

on their dealers and distributors.  … Gun manufacturers and importers could substantially reduce the illegal supply of guns by taking similar steps to control the chain of distribution for firearms … To properly control the distribution of firearms, gun manufacturers and importers should: identify and refuse to supply dealers and distributors that have a pattern of selling guns to criminals and straw purchasers. … To properly control the distribution of firearms: that members of the industry should develop a continual training program for dealers and distributors covering compliance with firearm laws" (Tr. at 1521-22, referring to LT 10, National Integrated Firearms Reduction Strategy).

59.     Again relying on ATF and industry documents, as well as established marketing principles and precepts, Professor Gundlach identified mechanisms that could have been employed by defendants – using their existing marketing infrastructures – to prevent 'diversion' or guns being acquired by prohibited persons (Tr. at 1525-27; Exhibits 2245 and 2246).  In Exhibits 2245 and 2246, Professor Gundlach identified the marketing strategies that were identified by members of the industry and government to address the forms of diversion, very few of which, he testified, were implemented by any of the defendants (Tr. at 1526).  These marketing strategies include:  requiring dealers and distributors to report the number of trace requests upstream to manufacturers and distributors; development of a management code that would establish standards of conduct on the part of members of the distribution system that would include guidelines regarding sales to types of dealers, such as stocking dealers with storefront establishments vs. dealers operating out of homes or non-commercial premises;  requiring minimum inventory; imposing liability insurance;  limiting sales at gun shows;  limiting

multiple sales; limitations on how the consumer gun transaction can be conducted to insure security; education and training of dealers; and monitoring dealers through visitation and interaction (Tr. at 1526-37).

60.     Professor Gundlach's analysis of each defendant was guided by a series of questions based on his extensive investigation into the facts of the case.  Prof. Gundlach testified about each defendant's specific practices, informed by an analysis based on a series of questions that, in his view as a marketing professional, would have limited or restricted diversion of guns to prohibited persons.  Those specific questions posed in his analysis were: (1) did the defendant sell or continue to sell to dealers or distributors who had been indicted; (2) did the defendant analyze trace information to identify problem dealers or distributors; did a manufacturer defendant require its distributors to sell only to dealers with a storefront place of business or manufacturers operating dealer direct programs require dealers to have a storefront place of business (and whether the distributor defendants directly required their dealers to have storefronts); (3) did the defendant restrict others in its downstream distribution system from selling at gun shows; (4) did the defendant disseminate information or provide training on how to prevent straw purchases, either through dissemination of the Don't Lie for the Other Guy Materials, or other educational information and did defendant require participation or education in programs designed to thwart straw purchasers; (5)  did the defendant limit its distribution partners from engaging or restricting multiple sales at the dealer level; (6) did the defendant require members in their distribution chain to take measures to prevent theft (Tr. at 1537-52).

61.     If there was evidence first that defendant recognized that information existed and could be used, that defendant received a green coding.  Prof. Gundlach also looked to see if the defendant actually used the information to exert control, awarding another green for evidence that control was actually taken (Tr. 1537-39).

**Defendants**

62.     a)     <u>AcuSport, Inc</u>.  AcuSport is a large national distributor of firearms located in Ohio.  The company sold an average of 111, 858 handguns per year for the years 1996-2000, and accounted for 9% of the total distributor sales for that period. (Allen Table 25B; Allen Exhibit 7C). AcuSport had an average of 827 young gun traces per year and an average of 891 total traces per year (Allen Tables 25B and 25A). AcuSport's ratio of young gun traces to sales is .88 and .89 is the ratio of all traces to sales (Allen Tables 25B and 25A).  AcuSport had 8% of all young crime gun traces for the distributor defendants in this action (Allen Exhibit 7C).   Further, Ms. Allen found that AcuSport consistently sold guns to the most problematic distribution outlets,  that is the 500 Dealers with the highest percentage of the following trafficking indicators: (1) handguns recovered with obliterated serial numbers;  (2) handguns traced with time to crime of less than 3 years; (3) handguns recovered in states other than where the handgun was sold at retail (out of state traces); (4) handguns recovered where the purchase by-passed a closer dealer;  (5) with multiple licenses at the same location; (6) traces of guns which were part of a documented multiple sales transaction; (7) handguns with multiple traces for the same purchaser; (8) handguns with multiple traces for the same purchaser at the same location (Allen Exhibit 29C).

b)      Dr. Andrews found that AcuSport sold 505 out of 9,290 crime guns that were recovered in the State of New York between 1996 and 2000 (Andrews Exhibit 25). AcuSport guns accounted for 374 out of 6,982 crime handguns recovered in New York City during that time period (Andrews Exhibit 22).

c)      Professor Gundlach found that AcuSport took very few steps to keep its guns out of the hands of misusers.  AcuSport indicated that it would sell firearms to indicted dealers; that it does not use available trace information to identify possible problem dealers; that it does not restrict sales at gun shows; that it does not disseminate straw purchase or "Don't Lie for the Other Guy" program materials; it does not take action on multiple sales by its dealers; it does not take preventive measures on theft of guns from its dealers (Gundlach Exhibit 2246).

63.      a)      <u>Alamo Leather Goods, Inc.</u> (hereafter "Alamo") is a small distributor of firearms and related supplies located in Texas. Alamo sold an average of 13,225 handguns per year for the years 1996 – 2000 and accounted for 1% of the sales of all distributors represented in this action (Allen Table 25B; Allen Exhibit 7C).  Alamo had an average of 241 traces per year, 2.2% of the traces of all defendant distributors and a ratio of traces to sales of 2.18% (Allen Table 25B).  Alamo's ratio of young gun traces was 2% (Allen Exhibit 7C). Ms. Allen found that Alamo sold guns to the most problematic dealers in all eight categories (Allen Exhibit 29C).

b)      Dr. Andrews found that Alamo sold 179 out of 9,290 guns that were recovered in crime in the State of New York  (Andrews Exhibit 25) and 132 out of 6,982 that were recovered in the City of New York (Andrews Exhibit 22).

c)        Professor Gundlach found that Alamo took no measures to prevent the diversion of guns from the legal to the illegal market and implemented no controls of any kind to prevent its dealers from diverting or facilitating the diversion of guns into the illegal market (Gundlach Exhibit 2246).  During his deposition for this action, Donald Byron Ervin, Alamo's president (Plaintiff's Exhibit 2200, deposition clips of Donald Ervin at p9) provided a reason for why he did not involve himself with monitoring in any way the trace requests received by Alamo from the BATF.  Mr. Ervin said, "I don't count them.  There's no money to be made in counting their paperwork" (Plaintiff's Exhibit 2200, deposition clips of Donald Ervin at p11).

64.        <u>Arms Technology, Inc.</u>  See Browning, at ¶ 72, below.

65.        a)        <u>Bangers, LP</u> is a medium-sized national distributor of firearms and shooting sports equipment headquartered in Alabama.  This company sold an average of 49,986 handguns per year between 1996 and 2000, representing 4% of the total distributor sales for that period (Allen Table 25B; Allen Exhibit 7C).  Bangers had an average of 229 young gun traces per year an average of 243 total traces per year (Allen Tables 25B and 25A).  Bangers' ratio of young gun traces to sales is .55; its ratio of all traces to sales is also .55 (Allen Tables 25B and 25A).  Bangers' traces accounted for 8% of all young gun traces for the distributor defendants in this action for the relevant time period (Allen Exhibit 7C).  Ms. Allen also found that Bangers consistently sold guns to the most problematic distribution outlets in all eight of the above-listed categories (Allen Exhibit 29C).

b)        Dr. Howard Andrews found that Bangers sold 149 out of 9,290 crime guns that were recovered in the State of New York (Andrews Exhibit 25) and sold 112 out of

6,982 of the handguns recovered in the City of New York between 1996 and 2000 (Andrews Exhibit 22).

        c)        Professor Gundlach found that although the evidence indicated that Bangers requires dealers to operate a storefront place of business, the company does not stop selling to dealers who have been indicted nor do they utilize trace information as a way to identify problem dealers. Other countermarketing actions Bangers does not use, as indicated by the evidence, are restrictions on gun show sales, anti-straw purchasing efforts, limits on multiple sales, and anti-theft measures (Gundlach Exhibit 2246).

        66.      a)        <u>Beemiller, Inc., d/b/a Hi-Point Firearms</u> (hereinafter referred to as "Hi-Point") is a manufacturer of firearms located in Ohio. Hi-Point sold an average of 27,649 handguns per year for the years 1996-2000, which accounted for 1.6% of the total US production during that period (Allen Table 24A). Of an average of 692 handguns traced per year for 1996-2000, an average of 649 of these traces were for young guns (Allen Tables 24A and 24B); this represents 6% of the total share of young gun traces by all manufacturers in this action (Allen Exhibit 6C). Hi-Point's ratio of young gun traces to sales is 3.63 and the ratio of all traces to sales is 3.61 (Allen Tables 24B and 24A). Ms. Allen found that 42% of Hi-Point's handguns sold in 1996 were used in a violent crime by 2000 (Allen Exhibit 10). Furthermore, Ms. Allen found that Hi-Point evidenced all the characteristics of sales to the most problematic dealers (Allen Exhibit 29A).

        b)        Dr. Andrews found that Hi-Point had 644 of its guns out of 15,838 total recovered in New York State between 1996 and 2000, representing 4.1% of the total guns recovered in that time (Andrews Exhibit 23). Dr. Andrews also found that Hi-Point guns

accounted for 511, or 4.4% of the handguns recovered in New York City during that time (Andrews Exhibit 21).

   c)  Professor Gundlach found that Hi-Point performs almost no steps to prevent their products from being mis-sold or misused.  Hi-Point does not take steps to analyze available trace information; prevent sales to non-storefront dealers or at gun shows; prevent straw purchases, multiple sales or thefts from occurring at dealer locations where the company's handguns are sold (Gundlach Exhibit 2245).

   67. a)  Bersa, S.A. is manufacturer of firearms in Argentina; Eagle Imports (below at ¶ 84) is the exclusive U.S. distributor of Bersa products (Plaintiff's Exhibit 2200, deposition clips of George Sodini at p158).  Bersa sold an average of 14,345 per year for the years 1996 through 2000, representing 0.8% of total production (Allen Table 24A).  Bersa has 88 young guns traced per year on average during that time period out of 91 average traces per year (Allen Tables 24B and 24A).  Ms. Allen found that Bersa guns represent 1% of the total young gun traces for all manufacturers between 1996 and 2000 (Allen Exhibit 6C).  Ms. Allen also found that Bersa guns have a ratio of young gun traces to sales is 0.93 and the ratio of all traces to sales is 0.91 (Allen Tables 24B and 24A); moreover, 15% of Bersa guns sold in 1996 were used in violent crime by 2000 (Allen Exhibit 10).  Bersa guns were identified as showing evidence of being sold to the 500 most problematic dealers (Allen Exhibit 29A).

   b)  Dr. Andrews' analysis showed that 56 Bersa handguns were recovered in New York State from 1996 to 2000, which accounts for 0.4% of all recovered handguns in that time period (Andrews Exhibit 23).  For the City of New York, Dr. Andrews found

that Bersa handguns accounted for 41, or 0.4%, of guns recovered during that time period (Andrews Exhibit 21).

c)      Professor Gundlach found that Eagle Imports, as the distributor of Bersa firearms, takes almost no steps to prevent its products from being sold to the wrong parties.  Eagle Imports did not evidence that they take measures to prevent illegal sales, straw purchases, multiple sales or thefts.  Eagle Imports also did not indicate that they restrict their dealers from selling at gun shows (Gundlach Exhibit 2245).

68.      a)      <u>Bill Hicks & Co.</u> (hereinafter "Bill Hicks") is a small- to medium-sized distributor located in Minnesota of "fall hunting and archery products," which includes handguns (Plaintiff's Exhibit 2200, deposition clips of Bill Hicks at p37).  Bill Hicks sold on average 22,429 handguns per year for the years 1996 through 2000, representing about 2% of total sales for distributor defendants in this action (Allen Table 25B; Allen Exhibit 7C).  Bill Hicks had 73 young guns traced out of 77 total handgun traces per year between 1996 and 2000 (Allen Tables 25A and 25B).  This represents only 1% of all young gun traces for distributors (Allen Exhibit 7C).  Bill Hicks has a comparatively low ratio of traces to sales for both young guns and handguns overall: these ratios are .38 and .39, respectively (Allen Tables 25A and 25B).  Despite this, Ms. Allen found that there is evidence of Bill Hicks' selling to the most problematic dealer group (Allen Exhibit 29C).

b)      Dr. Andrews found that 40 crime handguns distributed by Bill Hicks out of 9,290 total were recovered in New York State between 1996 and 2000 (Andrews Exhibit 25).  Dr. Andrews also found that 28 handguns distributed by Bill Hicks were

41

recovered in the City of New York, out of a total of 6,982 recovered during that time

period (Andrews Exhibit 22).

        c)        Professor Gundlach's analysis found that Bill Hicks had more

countermarketing tactics in place than any other distributor defendant.  Bill Hicks does

not sell to indicted dealers, uses/analyzes trace information, requires dealers to operate

from a storefront and disseminates straw purchase materials (Gundlach Exhibit 2246).

Mr. Bill Hicks, in his deposition, stated that he looks at traces to "see if there's an

unusual amount of traces in any particular store.  And we investigate why that is"

(Plaintiff's Exhibit 2200, deposition clips of Bill Hicks at p41).  However, Bill Hicks

does not implement restrictions on gun show sales by its distributors; does not train

dealers on straw purchases recognition tactics or disseminate "Don't Lie for the Other

Guy" materials; and does not implement strategies to prevent multiple sales and thefts at

the dealer level (Gundlach Exhibit 2246).

        69.      a)       B .L. Jennings, Inc. is a distributor of firearms located in Nevada.

B.L. Jennings sold on average 83,474 handguns each year between 1996 and 2000,

representing 6% of the market share for defendants in this action (Allen Table 25A and

Allen Exhibit 7C).  Compare this market share to B.L. Jennings' share of young crime

handgun traces during the same time period, which is 9% (Allen Exhibit 7C).  B.L.

Jennings had 994 young guns traced per year out of 1,020 handgun traces on average for

the years 1996 through 2000 (Allen Tables 25B and 25A).  B.L. Jennings was also found

in Ms. Allen's analysis to have a high ratio of traces to sales for both young guns and

handguns overall: these are 1.45 and 1.39, respectively (Allen Tables 25B and 25A).

Further, B.L. Jennings showed ample evidence of selling to the group of 500 of the most

problematic dealers (Allen Exhibit 29C).

        b)     Dr. Andrews found that B.L. Jennings had distributed 1,008 handguns that

were recovered in New York State out of a total of 9,290 recovered during 1996-2000

(Andrews Exhibit 25).  In New York City, Dr. Andrews found that B.L. Jennings

distributed guns that accounted for 753 out of 6,982 guns recovered during that time

period (Andrews Exhibit 22).

        c)     Professor Gundlach's analysis found that B.L. Jennings employs

practically no methods to counteract the wrongful and dangerous sale of their products.

The company does not employ methods of ceasing sales to indicted dealers and does not

seek to prevent the sale of firearms to non-storefront or gun show dealers, nor does it

assist its dealers in preventing straw purchases, multiple sales and thefts at the dealer

level (Gundlach Exhibit 2246).  The following quotation from the deposition Bruce

Jennings elucidates the company's policies with respect to their dealers:

        Q:     Was there any prohibition at any time for sales to gun show
dealers?

        A:     No, there was not.

        Q:     Were there any prohibitions, among your sales staff, for sales to
kitchen table dealers?

        A:     No, there was not (Plaintiff's Exhibit 2200, clip of Bruce Jennings
at p49).

        70.     a)     <u>Brazas Sporting Arms, Inc.</u> (hereinafter referred to as "Brazas") is

a small distributor of firearms located in Massachusetts.  For each of the years 1996

through 2000, Brazas sold on average only 2,110 handguns per year, representing just

0.2% of the total market share for distributor defendants in this action (Allen Table 25A).

Yet, Brazas has a very high ratio of traces to sales: for young guns, which represent 41 traces per year, the ratio is 2.32, and for all handguns, 45 traces per year, the ratio is 2.37 (Allen Tables 25A and 25B).  It is useful to compare these ratios to those of Bill Hicks (supra at ¶ 64), which company represents 2% of the market share but only has a trace to sale ratio of 0.38 (Allen Table 25A).   Ms. Allen's analysis found that Brazas showed evidence of a company that sells to the problem dealer group with the eight criteria described above (Allen Exhibit 29C).

b)      Dr. Andrews found that Brazas had distributed 61 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that Brazas distributed guns that accounted for 40 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)      Professor Gundlach found that Brazas employs few methods of monitoring the sale of their products to the end consumer.  Brazas does not employ methods of ceasing sales to indicted dealers and does not seek to prevent the sale of firearms to non-storefront or gun show dealers, nor does it assist its dealers in preventing straw purchases, multiple sales and thefts at the dealer level (Gundlach Exhibit 2246).

71.      a)      Braztech International L.C.  (hereafter "Braztech") is an importer of Rossi firearms, with offices located in Florida.  Braztech is related by interlocking corporate structure and ownership to Forjas Taurus and Taurus International Manufacturing Inc. (hereafter "TIMI").  For the years 1996 through 2000 Braztech sold an average of 9,640 guns per year, representing 0.6% of the total domestic production.  Braztech had approximately 7 young gun traces per year and 0.1% of all traces.  Its ratio

44

of traces to sales for those years is 0.11% (Allen Table 24D).  Ms. Allen found that

Braztech sells to only one problem dealer group, that is, the 500 dealers with the highest

percentage of multiple traces for the same purchaser at the same dealer (Allen Exhibit

29A).

       b)    Dr. Andrews' analysis demonstrated that there were no Braztech firearms

recovered in crime in the State of New York between 1996 and 2000. There were

however 357 Rossi handguns recovered in this State during that period, representing

2.5% of the total number of crime guns recovered in New York (Andrews Exhibit 23).

Rossi handguns made up 269, or 2.3% of the handguns recovered in New York City

during this same time period (Andrews Exhibit 21).

       c)    Professor Gundlach found that Braztech demonstrated evidence of control

in one of the six areas identified as designed to prevent diversion of the product from the

legal market:  that it disseminated materials on straw purchases to others in the

distribution channel and that there is evidence that defendant has trained others in their

distribution channel on straw purchases. No other measures of control were demonstrated

(Gundlach Ex. 2245).

    72.    a)    <u>Browning Arms Co.</u>, (hereinafter "Browning") is an importer of

firearms located in Utah.  It is a subsidiary of an international corporation, the Herstal

Group, and partly owned by the Waloon State in Belgium.  Browning distributes the

firearms of Arms Technology Inc. a Utah contractor that manufacturers .25 caliber

handguns exclusively for Browning.  Browning and Arms Technology sold an average of

38,502 handguns per year for the years 1996-2000, accounting for 2.3% of the domestic

market (Allen Table 24B; see also Allen Exhibit 6C).  Browning represented 3% of

handguns sold in 1996 that were used in Violent Crimes by 2000 (Allen Exhibit 10).  Ms. Allen found that Browning and Arms Technology sold guns to dealers in all of the Problem Dealer Groups (Allen Exhibit 29A).

b)      Dr. Andrews' analysis showed that 107 Browning handguns were recovered in New York State from 1996 to 2000, which accounts for 0.7% of all recovered handguns in that time period (Andrews Exhibit 23).  For the City of New York, Dr. Andrews found that Browning handguns accounted for 71, or 0.6%, of guns recovered during that time period (Andrews Exhibit 21).

c)      Professor Gundlach found that Browning demonstrated evidence of control in three of the six areas identified as designed to prevent diversion of the product from the legal market:  1) the evidence provided by defendant indicated that it requires that distributors sell to dealers who, in turn only sell to storefront place of business  and that it requires dealers in its dealer direct program to have a storefront place of business; 2)  the evidence indicates that Browning restricts their direct or program dealers from selling at gun shows; and 3)  the evidence indicates that defendant has disseminated material on straw purchases to others in their distribution system (Gundlach Exhibit 2245).

73.     a)      <u>Bryco Arms, Inc.</u>  (hereafter "Bryco") is a manufacturer of handguns located in Southern California.  By ownership it is related to B.L. Jennings, discussed at ¶ 69 above, which is Bryco's exclusive distributor.  Bryco appears consistently in the top ten crime guns in the ATF Youth Crime Gun Interdiction Initiative (YCGII) reports in evidence as LT 13 (see, for example, pp 5 and 6) and LT 156 (see PLTF 101103).  Mr. Vince has labeled Bryco guns "Saturday Night Specials" (Tr. at

2264) meaning they are a "cheap, inexpensive easily concealable firearm, and this firearm's manufacturer has not been around as long as other companies" (Tr. at 2249). Ms. Allen found that Bryco sold an average of 70,231 handguns per year for the years 1996-2000, accounting for 4.1% of total domestic production. The company had an average of 1,014 crime gun traces per year for those years, accounting for 9.2% of all traces. Bryco's ratio of traces to sales was 3.52 and had the fifth highest ratio of traces to sales of companies analyzed by Ms. Allen (Allen Table 24B, see also Allen Exhibit 6C). Bryco accounted for 34% of the crime guns sold in 1996 that were used in Violent Crime by 2000 (Allen Exhibit 10).   Ms. Allen found that Bryco sold guns to each of the Problem Dealer Groups (Allen Exhibit 29A).

b)      Dr. Andrews' analysis of the firearms trace database demonstrated that 1,245 crime handguns recovered in the State of New York were made by Bryco, accounting for 7.9 % of the total number of crime handguns recovered for the period 1996-2000 and making Bryco the third highest crime gun maker for the State of New York (Andrews Exhibit 23).  Dr. Andrews' analysis further found that Bryco is the third highest crime gun maker for the City of New York, with 961 guns, or 8.3%  of the total guns, recovered in the city from 1996-2000 (Andrews Exhibit 21).

c)      Professor Gundlach found that Bryco demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Exhibit 2245).

74.      a)      Camfour, Inc.  is a distributor of firearms and accessories located in Massachusetts.  On average Camfour sold an average of 33,694 handguns per year for the years 1996-2000, accounting for 2.6% of the handgun sales by distributors in this

47

action.  Camfour had an average of 206 young gun traces per year for those years,

accounting for 1.9% of all young gun traces.  Its ratio of traces to sales was 0.73% for

young gun traces and all traces. (Allen Tables 25A and 25B)  Ms. Allen demonstrated

that Camfour sold guns to each of the Problem Dealer Groups (Allen Exhibit 29C).

      b)    Dr. Andrews found that Camfour had distributed 223 handguns that were

recovered in New York State out of a total of 9,290 recovered during 1996-2000

(Andrews Exhibit 25).  In New York City, Dr. Andrews found that Camfour distributed

guns that accounted for 163 out of 6,982 guns recovered during that time period

(Andrews Exhibit 22).

      c)    Professor Gundlach found that Camfour demonstrated evidence of control

in one of the six areas identified as designed to prevent diversion of the product from the

legal market.  There was evidence presented that Camfour has stopped or would not sell

to dealers who were indicted (Gundlach Exhibit 2246).

      75.    a)    <u>Carl Walther, GmbH</u>, (hereafter "Walther").  Walther is an

importer of Walther handguns made by a related company in the Federal Republic of

Germany.  It has had a variety of importation and distribution arrangements over the

years and is currently using Smith & Wesson Corp., Earl's Repair Service and

Champion's Choice to distribute Walther guns. (Plaintiff's Exhibit 2200, deposition clips

of Carl Heinz Luther at pp95-96).  Walther sold an average of 15,996 handguns per year

for the years 1996-2000, accounting for 0.9% of the total domestic production.  It

received approximately 27 young gun traces per year, and 29 total gun traces per year

accounting in both instances for 0.2 % of all traces.  Walther's ratio of traces to sales was

0.26.  (Allen Tables 24A & 24B and Allen Exhibit 6C).  Walther had 7% of the handguns

sold in 1996 used in violent crime by 2000 (Allen Exhibit 10).  Ms. Allen found that
Walther sold guns to each of the Problem Dealer Groups (Allen Exhibit 29B).

      b)    Dr. Andrews found that 125 Walther handguns were recovered in crime in
the State of New York, accounting for 0.8% of the total number of crime guns recovered
in New York for that period (Andrews Exhibit 23).  Walther handguns accounted for 75
of the guns recovered in New York City – or 0.6% – during the time period (Andrews
Exhibit 21).

      c)    Professor Gundlach found that Walther demonstrated evidence of control
in none of the six areas identified as designed to prevent diversion of the product from the
legal market (Gundlach Exhibit 2245).

      76.    a)    <u>Century International Arms, Inc.</u> (hereafter "Century") is an
importer of army surplus weaponry located in Vermont and Florida.  Ms. Allen found
that Century sold an average of 16,433 handguns per year for the period 1996-2000,
accounting for 1% of the total domestic production.  Century received approximately 47
young gun traces per year or 0.4% of all young gun traces.  Its ratio of traces to sales was
0.45% (Allen Table 24D).  Ms. Allen found that Century sold guns to each of the
Problem Dealer Groups (Allen Exhibit 29A).

      b)    Dr. Andrews did not present evidence that any guns that were imported by
Century were recovered in crimes in New York State or City.

      c)    Professor Gundlach found that Century demonstrated evidence of control
in none of the six areas identified as designed to prevent diversion of the product from the
legal market (Gundlach Exhibit 2245).

77.   a)   <u>Charco 2000</u> is a domestic manufacturer of revolvers located in Connecticut.   Charco 2000 commenced production in 1998.   Ms. Allen was unable to present reliable evidence about Charco given the limited amount of data available

b)   Dr. Andrews did not identify any crime guns made by Charco 2000 and recovered in the State or City of New York.

c)   Professor Gundlach found that Charco 2000 demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Exhibit 2245).

78.   a)   <u>Chattanooga Shooting Supplies, Inc.</u> (hereafter "Chattanooga") is a wholesale distributor of firearms and accessories located in Tennessee.   Chattanooga sold an average of 11,625 handguns per year for 1996-2000, accounting for 0.9% of sales by the defendant distributors.   Chattanooga received an average of 60 young gun traces per year and 65 total gun traces per year for that period.   Its ratio of traces to sales was 0.62 for both young gun traces and all traces.   (Allen Tables 25A & 25B and Allen Exhibit 7C).   Ms. Allen found that Chattanooga sold guns to dealers in all of the Problem Dealer Groups (Allen Exhibit 29C).

b)   Dr. Andrews found that Chattanooga had distributed 78 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).   In New York City, Dr. Andrews found that Chattanooga distributed guns that accounted for 66 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)      Professor Gundlach found that Chattanooga demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2246).

79.    a)      <u>Colt's Manufacturing Company, Inc.</u>, (hereafter "Colt") is a domestic manufacturer of firearms located in Connecticut.  According to Ms. Allen Colt sold an average of 83,258 handguns per year for the period 1996-2000, accounting for 4.9% of total domestic sales.  Colt had an average of 168 young gun traces per year and 186 total traces per year.  Its ratio of traces to sales was 0.3% for both young gun and total traces.  (Allen Tables 24A & 24B; Allen Exhibit 6C). Colt had 4% of the handguns sold in 1996 that were used in violent crime in 2000. (Allen Exhibit 10).  Ms. Allen found that Colt sold its products to dealers in each of the Problem Dealer Groups (Allen Exhibit 29A).

b)      Dr. Andrews found that 463 Colt handguns were recovered in crime in the State of New York, accounting for 2.9% of the total number of crime guns recovered in New York for that period (Andrews Exhibit 23).  Colt handguns accounted for 302 of the guns recovered in New York City – or 2.6% of the total – during the time period (Andrews Exhibit 21).

c)      Professor Gundlach found that Colt demonstrated evidence of control in one of the six areas identified as designed to prevent diversion of the product from the legal market.  There was evidence presented that Colt restricted their distributors from selling at gun shows and restricts its distributors from selling to dealers who in turn sell at gun shows (Gundlach Exhibit 2245).

80.     a)     Ceska Zbrojovka, A.S. (hereafter "Ceska") is a manufacturer of handguns located in the Czech Republic that currently imports its products into the U.S. through its wholly-owned subsidiary, CZ-USA, Inc. (Plaintiff's Exhibit 2200, deposition clips of Alice Poluchova at p131). Before 1998, Ceska's exclusive importer was Magnum Research Inc. (see below at ¶ 107). Ms. Allen found that Ceska/CZ U.S.A. sold an average of 6,913 handguns per year for the years 1996-2000, representing 0.4% of total domestic production. The defendants had 24 young gun traces and 26 total traces. They had a ratio of traces to sales of 0.53 (Allen Tables 24A & 24B, Allen Exhibit 6C). Ceska and CZ accounted for 22% of the handguns sold in 1996 that were used in a violent crime by 2000 (Allen Exhibit 10). Ms. Allen found that Ceska and CZ sold to dealers in each of the Problem Dealer Groups (Allen Exhibit 29A).

b)     Dr. Andrews found that 9 guns made by Ceska were recovered in connection with a crime in the State of New York, accounting for 0.1 % of the total number of crime guns recovered during the period 1996 –2000 (Andrews Exhibit 23). For the same period in New York City, Dr. Andrews found that 7 Ceska guns were recovered, comprising 0.1% of the total crime handguns recovered in NYC (Andrews Exhibit 21).

c)     Professor Gundlach found that Ceska demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market. (Gundlach Exhibit 2245)

81.     CZ-USA, Inc.  See Ceska Zbrojovka at ¶ 80 above.

82.     a)     Davidson's, Inc. is a large wholesale distributor of firearms and accessories located in Arizona.   Ms. Allen found that Davidson's sold an average of

78,378 handguns per year, or 6% of all guns sold by the defendant distributors in this action for that period.  Davidson's had approximately 452 young gun traces per year and 483 total gun traces per year for 1996-2000 for a ratio of traces to sales of 0.70 for young gun traces and 0.69 for total traces (Allen Tables 25A & 25B and Allen Exhibit 7C).  Ms. Allen found that Davidson's sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

       b)     Dr. Andrews found that Davidson's had distributed 414 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that Davidson's distributed guns that accounted for 330 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

       c)     Professor Gundlach found that Davidson's demonstrated evidence of control in two of the six areas identified as designed to prevent diversion of the product from the legal market:  1) evidence was presented that Davidson's would not sell or had stopped selling to indicted dealers; and 2) evidence was presented that indicated that Davidson's restricted their dealers from selling at gun shows (Gundlach Ex. 2246).

      83.        a)     Dixie Shooter's Supply, Inc. (hereafter "Dixie") is a wholesale distributor of firearms and accessories located in Georgia. Ms. Allen found that Dixie sold an average of 24,206 handguns per year for 1996-2000, accounting for 1.9 % of all guns sold by the distributors in this action.  Dixie received an average of 188 young gun traces per year for 1996-2000 and 201 total traces per year.  Its ratio of both young gun and total traces to sales was 0.93 (Allen Tables 25A & 25B and Allen Exhibit 7C).

Ms. Allen found that Dixie sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

b)    Dr. Andrews found that Dixie had distributed 215 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that Dixie distributed guns that accounted for 163 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)    Professor Gundlach found that Dixie demonstrated evidence of control in one of the six areas identified as designed to prevent diversion of the product from the legal market:  there was evidence presented that Dixie has stopped, would not sell or stopped selling to indicted dealers. (Gundlach Exhibit 2246)

84.    a)    Eagle Imports, Inc. is an importer of handguns made by defendant Bersa (see ¶ 67) located in New Jersey.  It is related by ownership and operation to SG International and Import Sports, all of which are owned by the same individuals and operated in exactly the same way. The only difference is that each company imports the products of a different foreign manufacturer.  Ms. Allen found that Eagle sold an average of 14,345 handguns per year for 1996-2000, accounting for 0.8% of the total domestic production.  It had an average of 81 young gun traces for this period. Eagle had a ratio of 0.89 traces to sales for young guns (Allen Table 24D).   Ms. Allen found that Eagle sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29A).

b)    See ¶ 67 for Dr. Andrews' findings.

c)      Professor Gundlach found that Eagle and Import Sports demonstrated evidence of control in one of the six areas identified as designed to prevent diversion of the product from the legal market:  there was evidence presented that Eagle and Import Sports restricts their distributors from selling at gun shows. (Gundlach Exhibit 2245)

85.      a)      Ellett Brothers, Inc.  is a large wholesale distributor located in South Carolina. Ms. Allen found that Ellett Bros. sold an average of 110,916 handguns per year for 1996-2000, accounting for 8.5% of all guns sold by the distributors in this action.  Ellett Bros. received an average of 845 young gun traces per year for 1996-2000 and 911 total traces per year.  Its ratio of young gun traces to sales was 0.91 and total traces to sales was 0.92 (Allen Tables 25A and 25B; Allen Exhibit 7C).  Ms. Allen found that Ellett Bros. sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

b)      Dr. Andrews found that Ellett Bros. distributed 1014 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Ellett Bros. distributed guns that accounted for 814 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)      Professor Gundlach found that Ellett Bros. demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Exhibit 2246).

86.      a)      Euclid Avenue Sales Co. (hereafter "Euclid") is a small distributor primarily to pawn shops located outside Atlanta, Georgia.  Ms. Allen found that Euclid sold an average of 7,030 handguns per year for 1996-2000, accounting for 0.5% of all guns sold by the distributors in this action.  Euclid received an average of 353

young gun traces per year for 1996-2000 and 373 total traces per year.  Its ratio of young

gun traces to sales is 6.00 and its ratio of total traces to sales was 5.94. It is ranked

number one in highest ratio of traces to sales for all distributors (Allen Tables 25A &

25B; Allen Exhibit 7C).  Ms. Allen found that Euclid sold guns to dealers in each of the

Problem Dealer Groups (Allen Exhibit 29C).

b)        Dr. Andrews found that Euclid was the distributor of 508 handguns

recovered in New York State out of a total of 9,290 during 1996-2000 (Andrews Exhibit

25).  In New York City, Dr. Andrews found that Euclid distributed guns that accounted

for 417 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)         Professor Gundlach found that Euclid demonstrated evidence of control in

one of the six areas identified as designed to prevent diversion of the product from the

legal market:  there was evidence presented that Euclid required its dealers to operate out

of a storefront place of business (Gundlach Exhibit 2246).

87.            a)        <u>European American Armory Corp.</u> (hereafter "EAA") is the

exclusive importer of the firearms made by Tanfoglio Fratelli, SA (see ¶ 124). Ms.  Allen

found that EAA sold an average of 21, 443 handguns per year for the years 1996-2000,

representing 1.3% of total domestic production.  EAA had an average of 161 young gun

traces for those years. EAA had a ratio of young gun traces to sales of 1.18 (Allen Table

24D). Tanfoglio accounted for 24% of the handguns sold in 1996 that were used in a

violent crime by 2000 (Allen Exhibit 10).  Ms. Allen found that EAA sold to dealers in

each of the Problem Dealer Groups (Allen Exhibit 29A).

b)        Dr. Andrews found that 136 guns made by Tanfoglio Fratelli  were

recovered in connection with a crime in the State of New York, accounting for 0.9% of

the total number of crime guns recovered during the period 1996–2000 (Andrews Exhibit 23).  For the City of New York, Dr. Andrews found that 111, or 1% of the total amount, guns bearing this manufacturer's mark were recovered as crime guns (Andrews Exhibit 21).

        c)      Professor Gundlach found that EAA demonstrated evidence of control in one of the six areas identified as designed to prevent diversion of the product from the legal market:  there was evidence presented that EAA requires direct dealers or program dealers to have a storefront place of business (Gundlach Exhibit 2245)

        88.        a)     <u>Excel Industries</u> is a small manufacturer of handguns located in California. The President of the company was formerly the owner of another gun company known at Accu-tek (Plaintiff's Exhibit 2200, deposition clips of Larry D. Gilliam at p193).  Excel receives trace requests for Accu-tek firearms. (<u>Ibid</u> at 201).  Ms. Allen did not present evidence of sale, numbers of traces or crime gun trace to sale ratios for Excel/Accu-tek.  Ms. Allen did present evidence that Excel sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29A).

        b)      Dr. Andrews found that 34 guns made by Accu-tek were recovered in connection with a crime in the State of New York, which was 0.2% of the total amount (Andrews Exhibit 23).  Accu-tek guns accounted for 29 of the guns recovered in New York City during the time period, or 0.2% (Andrews Exhibit 21).

        c)      Prof. Gundlach found that Excel demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Exhibit 2245).

89.        a)        <u>Fabbrica d'Armi Pietro Beretta S.p.A.</u> (hereafter "Beretta") is a manufacturer of handguns located in Italy that imports its products into the U.S. through its wholly owned subsidiary, Beretta U.S.A. Corp. (Plaintiff's Ex. 2200, deposition clips of Jeffrey Reh at p207).  Ms.  Allen found that Beretta sold an average of 95,283 handguns per year for the years 1996-2000, representing 5.6% of total domestic production.  Beretta had an average of 287 young gun traces per year an average of 311 total traces per year.  Beretta had a ratio of young gun traces to sales of 0.48 and total traces to sales of 0.47 (Allen Tables 24A & 24B; Allen Exhibit 6C). Ms. Allen found that Beretta sold to dealers in each of the Problem Dealer Groups (Allen Exhibit 29A).

b)        Dr. Andrews found that 167guns made by Beretta were recovered in connection with a crime in the State of New York, accounting for 1 .1 % of the total number of crime guns recovered during the period 1996 –2000. (Andrews Ex. 23). Beretta's guns made up 2.3% of the crime guns recovered in the same time period in New York City, for a total 273 guns (Andrews Ex. 21).

c)        Professor Gundlach found that Beretta demonstrated evidence of control in three of the six areas identified as designed to prevent diversion of the product from the legal market: 1) evidence was presented that Beretta either stopped, would not sell or would stop selling to dealers that were indicted and that Beretta analyzes trace information to identify problem distributors or dealers; 2) evidence was presented that Beretta requires its direct dealers to have a storefront place of business; 3) evidence indicates that Beretta has trained others in their distribution system on straw purchases (Gundlach Ex. 2245).

90.         a)      <u>Faber Bros., Inc.</u> is a wholesale distributor of sporting goods located in Illinois that does a relatively small percentage of its business in firearms (less than 1%) (Plaintiff's Ex. 2200, deposition clips of Wayne Koclowski at p218).  Ms. Allen found that Faber Bros. sold an average of 14,738 handguns per year for 1996-2000, accounting for 1.1 % of all guns sold by the distributors in this action.  Faber Bros. received an average of 103 young gun traces per year for 1996-2000 and an average of 113 total traces per year.  Its ratio of young gun traces to sales was 0.84 and its ratio of total traces to sales was 0.86 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that Dixie sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

b)      Dr. Andrews found that Faber Bros. was the distributor of 63 handguns recovered in New York State out of a total of 9,290 during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that Euclid distributed guns that accounted for 43 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)      Professor Gundlach found that Faber Bros. demonstrated evidence of control in one of the six areas identified as designed to prevent diversion of the product from the legal market:  there was evidence presented that Faber Bros requires that their dealers operate from a storefront place of business (Gundlach Ex. 2246).

91.         <u>Glock GmbH</u> is a manufacturer of firearms located in Austria and the parent of the U.S. subsidiary Glock Inc. which is both the sole importer and assembler of Glock GmbH parts and firearms.  See ¶ 92 below.

92.         a)      <u>Glock, Inc.,</u> (hereafter "Glock") is the U.S. subsidiary of Glock GmbH located in Austria.  Glock Inc. imports Glock Austria handguns and

assembles Glock handgun parts made in Austria at its plant in Smyrna Georgia.

(Plaintiff's Ex. 2200, deposition clips of Paul Jannuzzo at p232).  Ms.  Allen found that

Glock GmbH and Glock, Inc. sold an average of 192,905 handguns per year for the years

1996-2000, representing 11.3% of domestic sales for the defendant manufacturers.  The

Glock defendants had an average of 833 young gun traces per year for 1996–2000 and an

average of 902 total traces per year for that period.  Glock had a ratio of traces to sales for

both young guns traced and total traces of 0.67 (Allen Tables 24A & 24B; Allen Ex. 6C).

Glock accounted for 8% of the handguns sold in 1996 that were used in a violent crime

by 2000 (Allen Ex. 10).  Ms. Allen found that Glock Inc. and Glock GmbH sold to

dealers in each of the Problem Dealer Groups (Allen Ex. 29A).

      b)     Dr. Andrews found that 659 guns made by Glock GmbH were recovered

in connection with a crime in the State of New York, accounting for 4.2 % of the total

number of crime guns recovered during the period 1996 –2000 (Andrews Ex. 23).  Dr.

Andrews found that 501 guns made by Glock GmbH were recovered during the same

time period, which is 4.3% of the total (Andrews Ex. 21).

      c)     Professor Gundlach found that Glock Inc. demonstrated evidence of

control in four of the six areas identified as designed to prevent diversion of the product

from the legal market: 1) evidence was presented that indicates that Glock requires that

distributors sell to dealers who in turn only sell to a storefront place of business and that

Glock requires its direct dealers to have a storefront place of business; 2) evidence was

presented that Glock restricts its direct or program dealers from selling at gun shows; 3)

evidence was presented that Glock has disseminated materials on straw purchases to

others in their distribution system; 4) evidence was presented that Glock requires that

members in their distribution system report incidents of thefts to Glock (Gundlach Ex. 2245).

93.      Forjas Taurus SA is a Brazilian manufacturer of firearms which are imported into the United States exclusively by its U.S. subsidiary Taurus Manufacturing Inc. (TIMI).  See ¶ 125 below.

94.      a)   Haskell Manufacturing, See Hi-Point/Beemiller at ¶ 66 above.  Haskell is a contract manufacturer for Hi-Point/Beemiller and the guns are sold exclusively by defendant MKS, see ¶ 108 below.  According to Ms. Allen, Haskell sold 5,954 handguns per year for 1996-2000. It had an average of 150 young gun traces per year and 163 total traces for this period.  Haskell's ratio of traces to sales for young guns is 3.63 and for all guns is 3.94 (Allen Tables 24A & 24B; Allen Ex. 6C). In addition, Haskell had 44% of the handguns sold in 1996 that were used in violent crime by 2000 (Allen Ex. 10). Ms. Allen found that Haskell sold guns to dealers in all the Problem Dealer Groups (Allen Ex. 29A).

b)   Dr. Andrews found that 159 guns made by Haskell were recovered in connection with a crime in the State of New York, accounting for 1% of the total number of crime guns recovered during the period 1996 –2000 (Andrews Ex. 23).  Dr. Andrews found that 135 guns made by Haskell were recovered during the same time period, which is 1.2% of the total (Andrews Ex. 21).

c)   Professor Gundlach relied on the Beemiller/Hi-Point materials to reach his conclusions regarding the marketing and distribution practices of Haskell, see ¶ 62 above.

95.      a)   Heritage Manufacturing, Inc. (hereafter "Heritage") is a domestic manufacturer of cowboy replica handguns located in Florida.   According to

Ms. Allen, Heritage sold an average of 25,514 handguns per year for the period 1996-2000, accounting for 1.5% of total domestic sales. Heritage had an average of 44 young gun traces per year and 50 total traces per year for that period. Its ratio of young gun traces to sales was 0.27% and 0.28 for total traces to sales (Allen Tables 24A & 24B; Allen Ex. 6C). Heritage had 2% of the handguns sold in 1996 that were used in violent crime in 2000 (Allen Ex. 10). Ms. Allen found that Heritage sold its products to dealers in each of the Problem Dealer Groups (Allen Ex. 29D).

b) Dr. Andrews found that 16 guns made by Heritage were recovered in connection with a crime in the State of New York, accounting for 0.19 % of the total number of crime guns recovered during the period 1996 –2000 (Andrews Ex. 23). Dr. Andrews also found that 11 guns made by Glock GmbH were recovered during the same time period, which is 0.1% of the total (Andrews Ex. 21).

c) Professor Gundlach found that Heritage demonstrated evidence of control in two of the six areas identified as designed to prevent diversion of the product from the legal market: 1) there was evidence presented that Heritage analyzes trace information to identify problem distributors or dealers; and 2) evidence was presented that Heritage requires that distributors sell to dealers who in turn only sell to a storefront place of business (Gundlach Ex. 2245).

96. a) Hicks Inc. is a wholesale distributor of firearms and accessories located in Alabama. Ms. Allen found that Hicks sold an average of 11,623 handguns per year for 1996-2000, accounting for 0.9 % of all guns sold by the distributors in this action. Hicks received an average of 69 young gun traces per year for 1996-2000 and 72 total traces per year. Its ratio of both young gun traces to sales is 0.71

and total traces to sales was 0.69 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that Hicks sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

      b)     Dr. Andrews found that Hicks had distributed 59 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that Hicks distributed guns that accounted for 42 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

      c)     Professor Gundlach found that Hicks Inc. demonstrated evidence of control in one of the six areas identified as designed to prevent diversion of the product from the legal market:  there was evidence presented that Hicks requires that their dealers operate from a storefront place of business (Gundlach Ex. 2246).

      97.     <u>Import Sports, Inc.</u> See Eagle Imports at ¶ 84 above.

      98.        a)     <u>Interstate Arms Corp.</u> (hereafter "Interstate") is a wholesale distributor of firearms and accessories located in Massachusetts and California. Ms. Allen found that Interstate sold an average of 34,934 handguns per year for 1996-2000, accounting for 2.7% of all guns sold by the distributors in this action.  Interstate received an average of 55 young gun traces per year for 1996-2000 and 58 total traces per year. Its ratio of both young gun and total traces to sales was 0.19 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that Interstate sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

      b)     Dr. Andrews found that Interstate had distributed 108 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000

(Andrews Exhibit 25).  In New York City, Dr. Andrews found that Interstate distributed guns that accounted for 76 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)       Professor Gundlach found that Interstate Arms demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2246).

99.       <u>Israel Military Industries, Ltd.</u> See Magnum Research at ¶ 107 below.

100.             a)       <u>KBI, Inc.</u> is an importer of firearms made by several European companies, including Charles Daly and FEG (Plaintiff's Ex. 2200, deposition clips of Michael Kassner at pp268-269). Ms. Allen found that KBI sold an average of 18,170 handguns per year for the years 1996-2000, representing 1.1% of total domestic production.  KBI had an average of 60 young gun traces per year for those years.  KBI had a ratio of young gun traces to sales of 0.52 (Allen Table 24D).  Ms. Allen found that KBI sold to dealers in each of the Problem Dealer Groups (Allen Ex. 29A).

b)       Dr. Andrews found that 101 guns made by FEG that were recovered in connection with a crime in the State of New York during the period 1996 –2000, accounting for 0.6% of the total crime guns recovered in the state during that time (Andrews Ex. 23).  0.7%, or 77 guns, was the number of handguns recovered in connection with a crime for New York City for 1996-2000 (Andrews Ex. 21).

c)       Professor Gundlach found that KBI demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2245).

101.     a)     <u>Kel-Tec CNC Industries, Inc.</u> (hereafter "Kel-Tec") is a domestic manufacturer of handguns located in Florida.   According to Ms. Allen, Kel Tec sold an average of 26,325 handguns per year for the period 1996-2000, accounting for 1.5% of total domestic sales.  Kel-Tec had an average of 224 young gun traces per year and 237 total traces per year for that period.  Its ratio of young gun traces to sales and overall traces to sales was 1.3 (Allen Tables 24A & 24B; Allen Ex. 6C). Kel-Tec had 7% of the handguns sold in 1996 that were used in violent crime in 2000 (Allen Ex. 10).  Ms. Allen found that Kel-Tec sold its products to dealers in each of the Problem Dealer Groups (Allen Ex. 29D).

b)     Dr. Andrews found that 43 handguns made by Kel-Tec were recovered in connection with a crime in the State of New York for 1996-2000, representing 0.3% of the total number of handguns recovered in New York State for this period (Andrews Ex. 23).  At the same time, 34 Kel-Tec handguns were recovered in New York City, or 0.3% of the total amount (Andrews Ex. 21).

c)     Professor Gundlach found that Kel-Tec demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2245).

102.     a)     <u>Kiesler's Police Supply, Inc.</u>, (hereafter "Kiesler's") is a wholesale distributor of firearms and accessories located in Indiana.  Ms. Allen found that Kiesler's sold an average of 27,730 handguns per year for 1996-2000, accounting for 2.1% of all guns sold by the distributors in this action.  Kiesler's received an average of 71 young gun traces per year for 1996-2000 and 77 total traces per year.  Its ratio of both young gun and total traces to sales was 0.33 (Allen Tables 25A & 25B; Allen Exhibit

7C).  Ms. Allen found that Kiesler's sold guns to dealers in each of the Problem Dealer

Groups (Allen Exhibit 29C).

      b)    Dr. Andrews found that Kiesler's had distributed 45 handguns that were

recovered in New York State out of a total of 9,290 recovered during 1996-2000

(Andrews Exhibit 25).  In New York City, Dr. Andrews found that Kiesler's distributed

guns that accounted for 40 out of 6,982 guns recovered during that time period (Andrews

Exhibit 22).

      c)    Professor Gundlach found that Kiesler's demonstrated evidence of control

in one of the six areas identified as designed to prevent diversion of the product from the

legal market:  there was evidence presented that Kiesler's has disseminated materials on

straw purchases to dealers and that it has trained its dealers on straw purchases (Gundlach

Ex. 2246).

      103.      a)    <u>Lew Horton Distributing Company, Inc.</u> (hereafter "Lew

Horton") is a wholesale distributor located in Massachusetts.  Ms. Allen found that Lew

Horton sold an average of 34,602 handguns per year for 1996-2000, accounting for 2.7%

of all guns sold by the distributors in this action.  Lew Horton received an average of 110

young gun traces per year for 1996-2000 and 120 total traces per year.  Its ratio of young

gun traces to sales is 0.38 and its ratio of total traces to sales is 0.39 (Allen Tables 25A &

25B; Allen Exhibit 7C).  Ms. Allen found that Lew Horton sold guns to dealers in each of

the Problem Dealer Groups (Allen Exhibit 29C).

      b)    Dr. Andrews found that Lew Horton had distributed 170 handguns that

were recovered in New York State out of a total of 9,290 recovered during 1996-2000

(Andrews Exhibit 25).  In New York City, Dr. Andrews found that Lew Horton

distributed guns that accounted for 111 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)      Professor Gundlach found that Lew Horton demonstrated evidence of control in one of the six areas identified as designed to prevent diversion of the product from the legal market:  there was evidence presented that Lew Horton has stopped, would not sell or stopped selling to indicted dealers and that defendant analyzes trace information to identify any problem distributors or dealers (Gundlach Ex. 2246).

104.    a)      Lipsey's, Inc. is a wholesale distributor located in Baton Rouge, Louisiana. Ms. Allen found that Lipsey's sold an average of 20,591 handguns per year for 1996-2000, accounting for 1.6% of all guns sold by the distributors in this action. Lipsey's received an average of 85 young gun traces per year for 1996-2000 and 91 total traces per year.  Its ratio of both young gun and total traces to sales was 0.50 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that Lipsey's sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

b)      Dr. Andrews found that Lipsey's had distributed 59 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that Lipsey's distributed guns that accounted for 40 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)      Professor Gundlach found that Lipsey's demonstrated no evidence of control in the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2246).

105.    Lorcin Engineering Co., Inc.  Defendant is in default.

106.    L.W. Seecamp Company, Inc.  Defendant is in default.

107.    a)    Magnum Research, Inc. (hereafter "Magnum") is an importer of handguns made by Israel Military Industries located in Minnesota.  Ms. Allen found that Magnum sold an average of 11,044 handguns per year for the years 1996-2000, representing 0.6% of total domestic production.  Magnum had an average of 35 young gun traces and 37 total traces per year for those years.  Magnum had a ratio of young gun traces to sales of 0.49 and a ratio of total traces to sales of 0.50 (Allen Tables 24C & 24D).  Ms. Allen found that Magnum sold to dealers in each of the Problem Dealer Groups (Allen Exhibit 29A).

b)    Dr. Andrews found that 44 guns made by Israel Military Industries and 2 guns made by Magnum were recovered in connection with a crime in the State of New York during the period 1996–2000 (Andrews Ex. 23).  For the guns recovered that were made by Israel Military Industries, 32 of them were recovered in New York City, or 0.3% of the total crime handguns recovered from 1996-2000 (Andrews Ex. 21).

c)    Professor Gundlach found that Magnum demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2245).

108.    a)    MKS Supply, Inc. (hereafter "MKS") is the exclusive distributor for Beemiller/Hi-Point and Haskell guns and is located in Ohio. (Plaintiff's Ex. 2200, deposition clips of Charles Brown at p333).  Ms. Allen found that MKS sold an average of 26,849 handguns per year for 1996-2000, accounting for 2.1% of all guns sold by the distributors in this action.  MKS received an average of 835 young gun traces per year for 1996-2000 and 892 total traces per year.  Its ratio of both young gun and total traces to

sales was 3.7 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that MKS

sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

b)      Dr. Andrews found that MKS had distributed 761 handguns that were

recovered in New York State out of a total of 9,290 recovered during 1996-2000

(Andrews Exhibit 25).  In New York City, Dr. Andrews found that MKS distributed guns

that accounted for 632 out of 6,982 guns recovered during that time period (Andrews

Exhibit 22).

c)       Professor Gundlach found that MKS demonstrated evidence of control in

none of the six areas identified as designed to prevent diversion of the product from the

legal market (Gundlach Ex. 2246).

109.    a)      <u>North American Arms, Inc.</u> (hereafter "NAA") is a manufacturer

of handguns located in Utah. According to Ms. Allen, NAA sold an average of 33,477

handguns per year for the period 1996-2000, accounting for 2.0% of total domestic sales.

NAA had an average of 104 young gun traces per year and 111 total traces per year for

that period.  Its ratio of young gun traces to sales and overall traces to sales was 0.48

(Allen Tables 24A & 24B; Allen Exhibit 6C). NAA had 4% of the handguns sold in 1996

that were used in violent crime in 2000 (Allen Exhibit 10).  Ms. Allen found that NAA

sold its products to dealers in each of the Problem Dealer Groups (Allen Exhibit 29D).

b)      Dr. Andrews found that 110 handguns made by NAA were recovered in

connection with a crime in the State of New York for 1996-2000, representing 0.7% of

the total number of handguns recovered in New York State for this period (Andrews Ex.

23).  In his analysis of crime handguns recovered in New York City, Dr. Andrews found

that 68 guns, or 0.6%, were manufactured by NAA (Andrews Ex. 21).

c)      Professor Gundlach found that NAA demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2245).

110.    a)      Para-Ordnance, Inc. is a Canadian manufacturer of handguns.  Its U.S. subsidiary Para-Ordnance Mfg., Inc. (located in Florida) is the exclusive importer of Para-Ordnance guns made in Canada.  According to Ms. Allen, Para-Ordnance sold an average of 13,106 handguns per year for the period 1996-2000, accounting for 0.8% of total domestic sales.  Para-Ordnance had an average of 33 young gun traces per year and 35 total traces per year for that period.  Its ratio of young gun traces to sales and overall traces to sales was 0.39 (Allen Tables 24A & 24B; Allen Exhibit 6C). Para-Ordnance had 4% of the handguns sold in 1996 that were used in violent crime in 2000 (Allen Exhibit 10).  Ms. Allen found that Para Ordnance sold its products to dealers in each of the Problem Dealer Groups (Allen Exhibit 29D).

b)      Dr. Andrews found that 16 handguns made by Para-Ordnance were recovered in connection with a crime in the State of New York for 1996-2000, representing 0.1% of the total number of handguns recovered in New York State for this period (Andrews Ex. 23).  The analysis for New York City found that Para-Ordnance firearms again accounted for 0.1% of the total crime guns recovered from 1996-2000, with 11 guns being recovered from connection to a crime (Andrews Ex. 21).

c)      Professor Gundlach found that Para-Ordnance demonstrated evidence of control in one of the six areas identified as designed to prevent diversion of the product from the legal market: there was evidence that Para-Ordnance requires distributors to sell to dealers who only sell out of a storefront place of business (Gundlach Ex. 2245).

111.   <u>Para-Ordnance Mfg., Inc.</u> See ¶ 110 above.

112.   a)   <u>Phoenix Arms</u> (hereafter "Phoenix") is a manufacturer of handguns located in California.  Phoenix made the model Raven .25 caliber handgun until 1998 (Plaintiff's Ex. 2200, deposition clips of David Brazeau at p374).  Mr. Vince included the model Raven in his list of handguns commonly considered to be "Saturday night specials" (Tr. at 2264). This firearm came in as the third most requested type of gun in New York City in the BATF's Youth Crime Gun Interdiction Initiative, Crime Gun Trace Analysis Report from 1997 (Exhibit LT 13 at p6).  According to Ms. Allen, Phoenix sold an average of 33,960 handguns per year for the period 1996-2000, accounting for 2.0% of total domestic sales.  Phoenix had an average of 307 young gun traces per year and 332 total traces per year for that period.  Its ratio of young gun traces to sales was 1.40 and overall traces to sales was 1.41 (Allen Tables 24A & 24B; Allen Exhibit 6C).  Ms. Allen's analysis also found that 13% of Phoenix handguns sold in 1996 were used in violent crime in 2000. (Allen Exhibit 10).  Ms. Allen found that Phoenix sold its products to dealers in each of the Problem Dealer Groups (Allen Exhibit 29D).

b)   Dr. Andrews found that 233 handguns made by Phoenix were recovered in connection with a crime in the State of New York for 1996-2000, representing 1.5% of the total number of handguns recovered in New York State for this period (Andrews Ex. 23).  Dr. Andrews further found that Phoenix had 168 of its guns recovered during the same time period on New York City, representing 1.4% of the total amount of recovered crime handguns (Andrews Ex. 21).

c)   Professor Gundlach found that Phoenix demonstrated evidence of control in one of the six areas identified as designed to prevent diversion of the product from the

legal market: there was evidence that Phoenix analyzes trace information to identify in any way problem distributors or dealers (Gundlach Ex. 2245).

113.    a)    Riley's Inc. is a wholesale distributor located in Indiana. Ms. Allen found that Riley's sold an average of 11,324 handguns per year for 1996-2000, accounting for 0.9 % of all guns sold by the distributors in this action. Riley's received an average of 336 young gun traces per year for 1996-2000 and 359 total traces per year. Its ratio of both young gun and total traces to sales was 3.55 (Allen Tables 25A & 25B; Allen Exhibit 7C). Ms. Allen found that Riley's sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

b)    Dr. Andrews found that Riley's had distributed 23 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25). In New York City, Dr. Andrews found that Riley's distributed guns that accounted for 16 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)    Professor Gundlach found that Riley's demonstrated evidence of control in two of the six areas identified as designed to prevent diversion of the product from the legal market: 1) evidence was presented that Riley's stopped, would not sell or would stop selling to indicted dealers; 2) evidence indicates that Riley's requires their dealers to operate from a storefront location (Gundlach Ex. 2246).

114.    a)    Ron Shirk's Shooters Supply (hereafter "Ron Shirk") is a wholesale distributor located in Pennsylvania. Ms. Allen found that Ron Shirk sold an average of 18,929 handguns per year for 1996-2000, accounting for 1.5% of all guns sold by the distributors in this action. Ron Shirk received an average of 42 young gun traces

per year for 1996-2000 and 50 total traces per year.  Its ratio of young gun traces to sales was 0.27 and total traces to sales was 0.29 (Allen Tables 25A & 25B; Allen Exhibit 7C). Ms. Allen found that Ron Shirk sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29D).

b)      Dr. Andrews found that Ron Shirk had distributed 131 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that Ron Shirk distributed guns that accounted for 102 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)      Professor Gundlach found that Ron Shirk demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2246).

115.    a)      RSR Group, Inc. (hereafter "RSR") is a large wholesale distributor with corporate headquarters in Florida and satellite locations throughout the country. Ms. Allen found that RSR sold an average of 213,411 handguns per year for 1996-2000, accounting for 16.4% of all guns sold by the distributors in this action.  RSR received an average of 1,708 young gun traces per year for 1996-2000 and 1,820 total traces per year. Its ratio of both young gun and total traces to sales was 0.96 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that RSR sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

b)      Dr. Andrews found that RSR had distributed 1,717 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that RSR distributed guns

that accounted for 1,197 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).  For both New York City and State, RSR's numbers of recovered handguns were the highest of any distributor named in this action (Andrews Exhibits 22 and 25).

c)      Professor Gundlach found that RSR demonstrated evidence of control in one of the six areas identified as designed to prevent diversion of the product from the legal market: there was evidence that RSR had disseminated materials on straw purchases to dealers and that RSR has trained dealers on straw purchases (Gundlach Ex. 2246).

116.    a)      Scott Wholesale, Inc. (hereafter "Scott Wholesale") is a wholesale distributor located in North Carolina. Ms. Allen found that Scott Wholesale sold an average of 18,096 handguns per year for 1996-2000, accounting for 1.3% of all guns sold by the distributors in this action.  Scott Wholesale received an average of 361 young gun traces per year for 1996-2000 and 378 total traces per year.  Its ratio of young gun traces to sales was 2.46 and its ratio of total traces to sales was 2.42 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that Scott sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

b)      Dr. Andrews found that Scott Wholesale had distributed 557 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that Scott Wholesale distributed guns that accounted for 466 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)      Professor Gundlach found that Scott demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2246).

117.     a)     Sigarms Inc. is the exclusive importer of SIG, Hammerli and Sauer firearms located in New Hampshire. According to Ms. Allen, Sigarms sold an average of 76,647 handguns per year for the period 1996-2000, accounting for 4.4% of total domestic sales.  Sigarms had an average of 188 young gun traces per year and 208 total traces per year for that period.  Its ratio of young gun traces to sales was 0.39 and overall traces to sales was 0.40 (Allen Tables 24A & 24B; Allen Exhibit 6C). Sigarms had 3% of the handguns sold in 1996 that were used in violent crime in 2000 (Allen Exhibit 10). Ms. Allen found that Sigarms sold its products to dealers in each of the Problem Dealer Groups (Allen Exhibit 29B).

b)     Dr. Andrews found that 165 handguns made by Sigarms were recovered in connection with a crime in the State of New York for 1996-2000, representing 1.0% of the total number of handguns recovered in New York State for this period (Andrews Ex. 23).  Dr. Andrews' analysis of handguns recovered in New York City found 115 of Sigarms' guns traced in the relevant time period, representing 1% of the total (Andrews Ex. 21).

c)     Professor Gundlach found that Sigarms demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2245).

118.     SIG/Sauer, see ¶ 117 above.

119.     SGS Importers International Inc. See Eagle Imports at ¶ 84 above.

120.     a)     Smith & Wesson Corp. is a large domestic firearm manufacturer located in Massachusetts.  According to Ms. Allen, Smith & Wesson sold an average of 287,084 handguns per year for the period 1996-2000, accounting for 16.8%

of total domestic sales.  Smith & Wesson had an average of 1,072 young gun traces per

year and 1,170 total traces per year for that period.  Its ratio of young gun traces to sales

was 0.58 and overall traces to sales was 0.59 (Allen Tables 24A & 24B; Allen Exhibit

6C). Smith & Wesson made 5% of the handguns sold in 1996 that were used in violent

crime in 2000 (Allen Exhibit 10).  Ms. Allen found that Smith & Wesson sold its

products to dealers in each of the Problem Dealer Groups (Allen Exhibit 29B).

   b)  Dr. Andrews found that 1,813 handguns made by Smith & Wesson were

recovered in connection with a crime in the State of New York for 1996-2000,

representing 11.4% of the total number of handguns recovered in New York State for this

period. (Andrews Ex. 23)  Dr. Andrews' analysis of handguns recovered in New York

City found 1,214 of Smith & Wesson's guns traced in the relevant time period,

representing 10.4% of the total (Andrews Ex. 21).

   c)  Professor Gundlach found that Smith & Wesson demonstrated evidence of

control in two of the six areas identified as designed to prevent diversion of the product

from the legal market:  1) there was evidence that Smith & Wesson requires dealers in its

direct dealer program to have a storefront place of business; and 2)  there was evidence

that Smith & Wesson restricts its distributors from selling at gun shows and that Smith &

Wesson restricts its distributors from selling to dealers who sell at gun shows (Gundlach

Ex. 2245).

   121. a)  <u>Sturm Ruger & Co., Inc.</u> (hereafter "Ruger") is the largest

domestic manufacturer of firearms and is a publicly traded company with its corporate

headquarters in Connecticut and manufacturing plants in New Hampshire and Arizona.

According to Ms. Allen, Ruger sold an average of 296,521 handguns per year for the

period 1996-2000, accounting for 17.3% of total domestic sales.  Ruger had an average of 1,381 young gun traces per year and 1,491 total traces per year for that period.  Its ratio of young gun traces and total traces to sales was 0.73 (Allen Tables 24A & 24B; Allen Exhibit 6C). Ruger made 7% of the handguns sold in 1996 that were used in violent crime in 2000 (Allen Exhibit 10).  Ms. Allen found that Ruger sold its products to dealers in each of the Problem Dealer Groups (Allen Exhibit 29B).

      b)      Dr. Andrews found that 1,108 handguns made by Ruger were recovered in connection with a crime in the State of New York for 1996-2000, representing 7.0% of the total number of handguns recovered in New York State for this period (Andrews Ex. 23).  Dr. Andrews' analysis of handguns recovered in New York City found 787 of Ruger's guns traced in the relevant time period, representing 6.8% of the total (Andrews Ex. 21).

      c)      Professor Gundlach found that Ruger demonstrated evidence of control in two of the six areas identified as designed to prevent diversion of the product from the legal market:  1) there was evidence that Ruger requires distributors to sell to dealers that have a storefront place of business; and 2) Ruger has disseminated materials on straw purchases to others in their distribution system (Gundlach Ex. 2245).

      122.    a)      <u>Southern Ohio Gun, Inc.</u> (hereafter "SOG") is a wholesale distributor located in Ohio. Ms. Allen found that SOG sold an average of 20,434 handguns per year for 1996-2000, accounting for 1.6% of all guns sold by the distributors in this action.  SOG received an average of 261 young gun traces per year for 1996-2000 and 279 total traces per year.  Its ratio of both young gun and total traces to sales was

1.53 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that SOG sold guns

to dealers in each of the Problem Dealer Groups (Allen Exhibit 29D).

      b)    Dr. Andrews found that SOG had distributed 356 handguns that were

recovered in New York State out of a total of 9,290 recovered during 1996-2000

(Andrews Exhibit 25).  In New York City, Dr. Andrews found that SOG distributed guns

that accounted for 271 out of 6,982 guns recovered during that time period (Andrews

Exhibit 22).

      c)    Professor Gundlach found that SOG demonstrated evidence of control in

none of the six areas identified as designed to prevent diversion of the product from the

legal market (Gundlach Ex. 2246).

      123.    a)    Sports South Inc. is a wholesale distributor of firearms and

accessories located in Louisiana. Ms. Allen found that Sports South sold an average of

86,994 handguns per year for 1996-2000, accounting for 6.7% of all guns sold by the

distributors in this action.  Sports South received an average of 441 young gun traces per

year for 1996-2000 and 475 total traces per year.  Its ratio of both young gun and total

traces to sales was 0.61 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found

that Sports South sold guns to dealers in each of the Problem Dealer Groups (Allen

Exhibit 29D).

      b)    Dr. Andrews found that Sports South had distributed 260 handguns that

were recovered in New York State out of a total of 9,290 recovered during 1996-2000

(Andrews Exhibit 25).  In New York City, Dr. Andrews found that Sports South

distributed guns that accounted for 198 out of 6,982 guns recovered during that time

period (Andrews Exhibit 22).

c)      Professor Gundlach found that Sports South demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2246).

124.    <u>Fratelli Tanfoglio S.n.c.</u> See EAA, at ¶ 87 above.

125.    a)      <u>Taurus International Manufacturing, Inc.,</u> (hereafter "TIMI") is the U.S. subsidiary of the Brazilian firearm manufacturer Forjas Taurus located in Florida. TIMI imports Forjas Taurus firearms and manufacturers Taurus firearms in Florida.  Ms. Allen found that TIMI and Forjas Taurus, hereafter simply referred to as Taurus sold an average of 137,358  handguns per year for the years 1996-2000, representing 8.0% of total domestic production.  Taurus had an average of 645 young gun traces per year for 1996–2000 and an average of 687 total traces per year for that period.  Taurus had a ratio of traces to sales for both young guns traced and total traces of 0.73 (Allen Tables 24A & 24B; Allen Exhibit 6C). Taurus accounted for 11% of the handguns sold in 1996 that were used in a violent crime by 2000 (Allen Ex. 10).  Ms. Allen found that Taurus sold to dealers in each of the Problem Dealer Groups (Allen Ex. 29B).

b)      Dr. Andrews found that 719 guns made by Taurus International were recovered in connection with a crime in the State of New York, accounting for 4.5% of the total number of crime guns recovered during the period 1996–2000. (Andrews Ex. 23).  In a similar analysis for New York City's handguns recovered in connection with a crime, Dr. Andrews found 530 guns recovered, or 4.6% of the total (Andrews Ex. 21).

c)      Professor Gundlach found that Taurus demonstrated evidence of control in five of the six areas identified as designed to prevent diversion of the product from the legal market: 1) evidence was presented that indicates that Taurus requires that

distributors sell to dealers who in turn sonly sell to a storefront place of business and that Taurus requires its direct dealers to have a storefront place of business; 2) evidence was presented that Taurus has disseminated materials on straw purchases to others in their distribution system and that Taurus has trained others in their distribution system on straw purchases; and 3) evidence was presented that Taurus requires members in their distribution system to take measures to prevent theft (Gundlach Ex. 2245).

126.   a)   <u>Valor Corporation</u> (hereafter "Valor") is a wholesale distributor located in Georgia. Ms. Allen found that Valor sold an average of 13,857 handguns per year for 1996-2000, accounting for 1.1% of all guns sold by the distributors in this action. Valor received an average of 140 young gun traces per year for 1996-2000 and 150 total traces per year.  Its ratio of young gun traces to sales was 1.20 and the ratio of total traces to sales was 1.21 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that Valor sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29D).

b)   Dr. Andrews found that Valor had distributed 361 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that Valor distributed guns that accounted for 279 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)   Professor Gundlach found that Valor demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2246).

127.   a)   <u>Walter Craig, Inc.</u> is a wholesale distributor located in Alabama. Ms. Allen found that Walter Craig sold an average of 30,670 handguns per year for 1996-

2000, accounting for 2.4% of all guns sold by the distributors in this action.  Walter Craig received an average of 180 young gun traces per year for 1996-2000 and 191 total traces per year.  Its ratio of both young gun traces to sales and of total traces to sales was 0.70 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that Walter Craig sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29D).

b)      Dr. Andrews found that Walter Craig had distributed 223 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that Walter Craig distributed guns that accounted for 169 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

c)      Professor Gundlach found that Walter Craig demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2246).

128.    a)      <u>Williams Shooter's Supply, Inc.</u> is a wholesale distributor located in Illinois.  Ms. Allen found that Williams Shooter's Supply sold an average of 35,934 handguns per year for 1996-2000, accounting for 2.8% of all guns sold by the distributors in this action.  Williams Shooter's Supply received an average of 140 young gun traces per year for 1996-2000 and 150 total traces per year.  Its ratio of young gun traces to sales was 0.46 and the ratio for total traces to sales was 0.47 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that Williams Shooter's Supply sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29D).

b)      Dr. Andrews found that Williams Shooter's Supply had distributed 35 handguns that were recovered in New York State out of a total of 9,290 recovered during

1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that William's Shooter's Supply distributed guns that accounted for 24 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

      c)     Professor Gundlach found that Williams Shooter's Supply demonstrated evidence of control in only one of the six areas identified as designed to prevent diversion of the product from the legal market – the company indicated that it would not or does not sell guns to indicted dealers (Gundlach Ex. 2246).

      129.    a)    <u>Zanders Sporting Goods, Inc.</u> (hereafter "Glenn Zanders") is a wholesale distributor located in Illinois. Ms. Allen found that Glenn Zanders sold an average of 16,040 handguns per year for 1996-2000, accounting for 1.2% of all guns sold by the distributors in this action.  Glenn Zanders received an average of 88 young gun traces per year for 1996-2000 and 94 total traces per year.  Its ratio of both young gun and total traces to sales was 0.66 (Allen Tables 25A & 25B; Allen Exhibit 7C).  Ms. Allen found that Glenn Zanders sold guns to dealers in each of the Problem Dealer Groups (Allen Exhibit 29C).

      b)    Dr. Andrews found that Glenn Zanders had distributed 29 handguns that were recovered in New York State out of a total of 9,290 recovered during 1996-2000 (Andrews Exhibit 25).  In New York City, Dr. Andrews found that Glenn Zanders distributed guns that accounted for 21 out of 6,982 guns recovered during that time period (Andrews Exhibit 22).

      c)    Professor Gundlach found that Glenn Zanders demonstrated evidence of control in none of the six areas identified as designed to prevent diversion of the product from the legal market (Gundlach Ex. 2246).

## III. EVIDENCE IN THE RECORD DEMONSTRATED SPECIFIC INJURY SUFFERED BY PLAINTIFF NAACP

130.    Gun violence and the threat of pervasive gun violence caused specific harm to the NAACP in the State and City of New York. According to Kweisi Mfume, Executive Director of the NAACP (hereafter "Mfume") in his testimony in this action, "This has been a very expensive issue for us, particularly so here in New York" (Tr. at 754).  Evidence presented that the Association has been harmed in its ability to organize and maintain its membership in communities as a result of the reluctance of volunteer members to venture out at night to attend meetings and in the expenditure of programmatic funds on youth violence prevention programs (Tr. 754-5).

131.    The NAACP is a "civil rights organization, which was established to protect the economic, political and social and civil rights of <u>minorities</u> in this country" (testimony of Mildred Bond Roxborough, Tr. at 269-270, emphasis added). It is a New York corporation, founded in New York City in 1909 (Tr. 270). It is a membership organization composed of branches (or 'units') that must have at least 50 members and are chartered by the national organization (Tr. at 270, 273-4).  There are 1700 adult units and 500 youth and college units in the 50 states (Tr. at 270), and 23 branches in the metropolitan area of New York (Tr. at 280) and 30 to 40 branches in the State of New York (Tr. at 752).

132.    The branches carry out the Association's national programs in the areas of health, education, housing, employment and economic development and are "designed to improve conditions in their communities" for both members and constituents (Tr. at 274).

The health program encompasses "all aspects of good quality of life, including prevention of illness and injury and violence" (Tr. at 273).  Included in the national health program is a youth violence intervention component that concentrates on young people up to the age of 30.  This youth violence program created task forces to engage in counseling and outreach to teach conflict resolution without resort to violence and to work to prevent violence (Tr. at 280).  New York City is one of the 100 cities targeted for this program due to the large size of its minority youth population.  Proactive programs such as "Stop the Violence Start the Love" and the Hip Hop Summit designed to dissuade young people from thinking that "a gun is the way you settled things" expended Association funds and staff time for work in the City and State of New York (Tr. 755, 757, Mfume testimony).

133.    Ms. Roxborough testified that funds had to be expended at the New York Office to secure it against the threat of gun violence (Tr. at 279).  In addition, the threat of gun violence has adversely affected the ability of the NAACP to organize and to function as a membership organization in certain New York communities plagued by gun violence.   Specifically, Ms. Roxborough testified that the majority of NAACP volunteers are women, and "in recent years it has become very difficult to get enough volunteers to attend our meetings and to carry out certain projects.  The meetings are scheduled in the evenings, and the reason that [they do not attend] is because they feel afraid to come out of their homes at night and … come to an NAACP office or a church" (Tr. at 279).  The harm to the ability of the organization to attract and keep members and to perform the work of the Association was also testified to by Mr. Mfume:   "It is very difficult … to organize communities [where] many of the people in the communities are afraid to come

out to organizational meetings and conferences and other things because they fear that the

level of violence is so high and that the use of handguns in violent crime is so high that

they oftentimes make a decision not to do that, that they will stay where they are.  It has

become more difficult for us to organize communities" (Tr. at 754-55).

     134.    Evidence was adduced that the NAACP's work and organization has

historically been on behalf of the constituents of the NAACP, not just its immediate

members.  As Ms. Roxborough testified,

> These programs [those conducted under the auspices of the national office] are
> designed to improve conditions in their communities, and as a result of the
> activities that we have, programmatic activities, our constituents are people who
> are not necessarily members and some will never become members, but who
> benefit by the activities and programmatic successes and goals that we achieve.
> As a matter of fact, most of the people who we help in specific instances, in
> certain litigation and other cases were not members at the time that we were
> helping them.  They would become subsequently (Tr. at 274).

Thus, NAACP constituents are prospective members; both are harmed by gun violence in

predominantly African American communities.

     130.    Plaintiff proffered two NAACP members who had suffered direct injuries

as a result of the use of a handgun: Gladys Gerena and MonaLisa Harris (Docket No.

1130, Plaintiff's Witness List). Defendants moved to exclude the testimony of these

witnesses. In argument on this issue, the Court stated as follows:

> THE COURT:  General motion number 6, Gerena and Harris.  That's with respect
> to specific acts. I don't want any specific acts.

> MS. CONNELL: [for plaintiff]: It goes to injury showing injury due to gun
> violence in this state.

> THE COURT: You're going to have experts who are going to testify that X
> number of people were murdered in districts of significance, correct?

MS. BARNES: [for plaintiff] Yes.

THE COURT: Everybody knows that when you murder, it's an injury.  I don't want anything specific.  I'm not going to have a parade of horribles here.  This is a statistical case.

MS. BARNES: Then there is no standing issue with regard to the NAACP members in the State of New York.

THE COURT:  Excuse me, if you want to make a motion to withdraw your case, I'll take it.

MS. BARNES: I don't want to make that motion.

(Tr. march 28, 2003, at 361)

135.    Further, in an Order dated March 28, 2003, memorializing the decisions

entered on the oral record on March 28, 2003, this Court held as follows:  "Defendants'

motion to bar the testimony of Gladys Gerena and MonaLisa Harris is granted.  This is

primarily a statistical case; there is no need for testimony concerning specific acts of gun

violence" (Docket No. 1295, dated April 9, 2003).  More, on objection by defense

counsel, the NAACP witness Ms. Roxborough was not permitted to testify about her

knowledge of these members' injuries or any other specifics:

Q:  Ms. Roxborough, do you have knowledge of the harm that
the NAACP members and constituents have suffered in the State of New York
as a result of gun violence?

A:  Yes.

Q:  What is the nature of your knowledge in that aspect?

MR. GROSS:  Your Honor please.  I think the witness is going well beyond any
area she should.  She indicated this is an authorized action on behalf of the organization
she represents here, and anything else is not relevant to the proceeding.  I understand
she's been involved in this area for many years. Most respectfully, I think it is irrelevant.

THE COURT:  Well, the witness has to tell us what she knows herself.

MR. GROSS:  Yes.

THE COURT:  About any impact on the NAACP or whatever is relevant, not what she's heard about gun shootings and things like that. Proceed" (Tr. at 278).

136.    Finally,  in addition to demonstrating special injury to the organization in expenditure of funds, loss of members, diversion of program resources and inability to organize in African American communities plagued by gun violence,  plaintiff has also demonstrated, beyond all contest, that African Americans in the City and State of New York are many, many times more likely to be the victims of the widespread criminal proliferation of handguns and that they are many times more likely than their counterparts of other races to be affected by the contagion of gun proliferation leading to gun violence. Thus, as demonstrated demographically and statistically by plaintiff's experts Prof. Fagan and Dr. Andrews, the probability of harm to one of the NAACP's members is extraordinarily high and sufficient to support a finding of special injury to the NAACP.

IV.    REMEDIES

A.    **Evidence Presented**

Gerald Nunziato and Joseph Vince testified about the services offered to gun manufacturers, distributors and dealers to assist them in using the trace database to supervise their distribution partners (Nunziato Testimony, April 4, 2003, Tr. at 1006 et seq.; Vince Testimony, April 14, 2003, Tr. at 2295-96).  The services described by Mr. Nunziato and Mr. Vince, would have provided defendants the ability to review the trace database and analyze the information presented therein.  By using the database and imposing disclosure requirements,

the manufacturers and distributors could impose normative standards on the

conduct of their distribution partners.  Lack of adherence to these standards,

unlike lack of adherence to the unenforced and unenforceable laws, would result

in the adverse consequence of termination.

Mr. Vince testified that his company, Crime Gun Solutions was "offering

training in how to use crime gun information, in how to collect it, how to analyze

it, what enforcement techniques that you could use that would reduce the

accessibility and availability of crime guns to criminals" (Tr. at 2296).  One of the

services Mr. Vince and his partners offered to gun manufacturers and one gun

maker in particular was described by Mr. Vince as follows:

> We took the tack that if we could get the firearms industry to accredit and to
> monitor the industry very similar to how other manufacturers do, then it would
> have a huge, significant effect, especially when we are only talking about a small
> number of dealers that are the problem.  We thought that that would have a huge
> impact on violent crime and [we] reached out to the industry to help them do that
> (Tr. at 2297).

In explaining the proposed accreditation program, Mr. Vince stated,

> We looked at how other industries accredit their sales people, their repairmen,
> whether it's automobile repairman or the ABA or bar association.  You train
> people. You make sure they know what their job is supposed to be and how to do
> it.  You test them to make sure that in fact they make them constantly aware and
> you give them that seal that they have done that.  So that everybody knows that
> when they are dealing with these people … they are in that standard that's
> expected of any industry (Tr. at 2298-99 and Plt. Exhibit 2126, Vince Letter to
> Hindle).

Dealer accreditation would establish acceptable norms, which if deviated from

would lead to investigation, further training and possibly the discontinuance of selling

products to a given dealer (Tr. at 2303).  Mr. Vince testified about the type of training

and standards manufacturers and distributors could require dealers to adhere to would include:

> looking at dealers that would have records that were improperly maintained;  [dealers] not responding to law enforcement's requests; [dealers] that have an enormous amount of crime guns being sold" (Tr. at 2304).

Neither Mr. Vince nor Mr. Nunziato at any time proposed that the members of the industry undertake criminal investigations.  Both former ATF agents were adamantly opposed to such a suggestion (Vince, Tr. at 2306-07; Nunziato, April 4, 2003, Tr. at 1026-28). The type of industry monitoring that was offered to gun makers and distributors by Mr. Vince and Mr. Nunziato would not have adversely affected ATF's enforcement activities or ability to conduct criminal investigations (Tr. at 2307-08), limited though they are.  (See also Higgins Tr. at 639, re: suggestion that reporting traces received by dealer would not jeopardize any investigation by BATF.)  Moreover, Mr. Vince has concluded that the type of proactive monitoring or standard setting by the industry of its members would have a deterrent effect even in the secondary market (Tr. at 2309): "it would have an absolutely tremendous effect on the secondary market.  … We found in doing the studies that … retail dealers are very much a part of, a big part of the secondary market,  that firearms – not only that they sell but firearms that are used come back into their hands on a resale basis  (Tr. at 2309).

Mr. Higgins testified extensively about what the industry members could do to prevent the diversion of firearms, given the legal and budgetary constraints which prevent ATF from adequately monitoring the industry.  See generally, Higgins Testimony at Tr. 636-646, covering: a) a  periodic inventory requirement (636); b)  distributor agreements covering standards for entities selling a manufacturer's or distributor's guns (636-37); c)

reporting the number of crime gun traces received by dealers to manufactures and distributors (637); d) selling only to retailers who agreed to train their employees; e) business arrangements permitting manufacturers/distributors to cut off indicted dealers; f) security of shipment and anti-theft requirements by dealers and common carriers (Tr. at 641).

Robert Ricker described several programs contemplated by members of the industry to regulate dealers: dealer training programs, (Ricker, April 8, 2003, Tr. at 1272-74, 1358), dealer certification program and codes of conduct (Id. and Tr. at 1296), multiple sale restriction program (Tr. at 1375). With regard to how the industry could control multiple sales, which are demonstrably linked to gun trafficking, Mr. Ricker testified as follows on cross examination: "What I advocated at ASSC for a long time was a coordinated approach where you would limit one gun to the purchase that he could take with him. If he wanted to make a multiple purchase, but if he wanted to come back for other guns, he can come back to pick them up, after we were sure that the multiple sales form was in the hands of law enforcement, not only ATF, but also the local authorities, not only where the sale was being made, but also where the purchaser resided. Because, as we knew, a lot of criminals would travel outside of their home areas where the were known as criminals and buy firearms" (Tr. at 1375).

The analysis performed by plaintiff's non-ATF and non-law enforcement experts – Prof. Gundlach and Ms. Allen – confirms the testimony of Messrs. Vince, Nunziato and Higgins: that the imposition of controls over the distribution partners will decrease crime gun flows. As presented above, Ms. Allen analyzed practices by defendant manufacturers and distributors and found that the imposition of certain practices over

downstream distributors and dealers has a statistically significant effect on crime gun

flows (Allen Testimony, Tr. at 3093).  Her findings regarding the practices are consistent

with her analysis that the decrease in the number of dealers has a statistically significant

relationship to the decrease in homicides in the crime gun destination state (Allen

Testimony, Tr. at  3007;  and see Ms. Allen's Exhibit 12C: Decreases in Dealers,

Production and Homicides).

Further, Ms. Allen found that under Professor Gundlach's coding scheme, there

was a statistically significant relationship between the taking of steps to prevent diversion

(See Exhibits 2245 and 2246) and the reduction in crime gun ratios (Allen, Tr. at  3085 et

seq.).

B.       **Proposals for Implementation**

As the evidence presented at trial demonstrates, from an empirical and

experiential basis, close supervision of the distribution and sales of firearms decreases

crime gun flows that occur either through dealer misconduct,  inadequate security, or

inadequate staff training.

In order to accomplish the thorough oversight of a product's shipment, storage,

and retail sale as well as having the capability to take appropriate action when

deficiencies are discovered within the network, the collection and use of timely

information is paramount.  Therefore, plaintiff recommends the establishment of an

independent entity to objectively collect, store, analyze, interpret and report findings to

the manufactures with regard to the distribution and sales practices of its downstream

dealers.   In this manner, the manufacturers and distributors will be supplied with the

knowledge necessary to ensure consistent and competent distribution and sales practices

necessary to ensure that the sale of their manufactured products is undertaken by dealers that meet the highest ethical and knowledgeable standards.

**Creation of Independent Oversight Entity (IOE):**   To facilitate the establishment of standards, the monitoring of the dispersal practices of firearm distributors and retail dealers, and the identification of deficiencies and appropriate corrective remedies, an Independent Oversight Entity should be created under the supervision of the Federal District Court.  One of the primary objectives of the IOE will be to identify and prepare written business and operating standards with regard to the sale of firearms from distributors and retail dealers of the participating manufacturers. The IOE will also be responsible for the assembling of all relevant information from participating manufacturers, distributors and retail dealers; requesting and collecting of data from appropriate law enforcement agencies; the analization and interpretation of the collected data; the preparation and submission of reports to firearm manufacturers or their representatives with regard to the adherence of standards and ethics by individual distributors and retail dealers; verification sampling; recommendations for the corrective action for participants who initially fall short of the minimum standard and the conducting of on-site inspections of participating distributors and retail dealer premises and records.

The IOE, functioning under supervision of the Federal District Judge, will prepare quarterly reports to the Court covering Plans, Progress and Problems.  Examinations and reports conducted by the IOE of crime-gun data will report to manufactures or their representatives the following:

- The number of crime-gun traces from participating distributors and retail dealers;

- Unsuccessful crime-gun traces involving a lack of acquisition or disposition records;

- The number of firearms reported stolen or missing from a distributor or dealer;

- Crime-guns most associated with unsuccessful traces by a distributor or retail dealer;

- The number of crime-gun reported stolen and later traced;

- Crime-guns recovered in the possession of juveniles;

- Crime-guns that were recovered with obliterated serial numbers;

- Crime-guns that have a short time-to-crime;

- Identification of distributors and retail dealers that do not adequately respond to crime-gun traces;

- Distributors and retail dealers' explanations given for why they could not provide disposition for a crime-gun;

- Identification of distributors and retail dealers that could not be located by the Bureau of Alcohol, Tobacco and Firearms and Explosives' (ATF) National Tracing Center (NTC);

- Identification of distributors and retail dealers that are most associated with crime-guns recovered from juveniles;

- Identification of distributors and retail dealers who repeatedly reported stolen or missing firearms.

- The number of multiple sales; and,

- The number of multiple sale transactions. *

*This list should not be considered all inclusive, as other indicators and information could be uncovered that would be of interest to manufactures, law enforcement and the Court.

The IOE will also be responsible for formulating and dispensing training and testing of participating distributors and retail dealers' employees.  The IOE will also be responsible for researching and recommending physical facilities and inventory security of distributors and retail dealers. Based on the pass/fail of these training and security requirements, the IOE will authorize a letter of certification for a specific period of time. Verification and adherence by distributors and dealers to the standards of certification will be determined by the IOE using scheduled audits and silent and/or unknown shopper tests.

**Certified Distributors and Retail Dealers:** Firearm manufacturers and distributors should be required to distribute their product only through distributors and retail dealers that have successfully completed the required training and continued participation required for certification by this entity and distributors and dealers who have earned IOE Certification will be presented with a sealed certification and listed as such on the IOE website.

In addition to participating in on going industry data collection and oversight endeavor, the Court should order the manufacturers to adhere to the following standards in their relationship with distributors and retail dealers:

**Retail Dealers:** Manufactures and distributors should only allow their products to be distributed through retail dealers who adhere to the following: (1) maintenance of a store-front premises; (2) maintain operative insurance; (3) participate in safe sales practice training provided by the IOE, in addition to any training offered by any industry group or law enforcement agency; (4) maintain a minimum inventory of $250,000; (5) sell more than one handgun per month per customer, (6) allow manufacturers to review the retail dealers' firearm acquisition and disposition book (also known as a "bound book"), and all other records relating to sales at least four times per year; (7) allow manufacturers to review records relating to sales incentives or product promotions maintained by the retail dealer at least four times per year and (8) maintain and provide to the manufacturer state sales data on a monthly basis.

**Distributors:** Manufacturers should only sell their products to distributors that adhere to the following: (1) maintain operative insurance; (2) participate in safe sales practice training provided by the IOE, in addition to any training offered by an industry group or law enforcement agency; (3) allow manufacturers to review the distributors' firearm acquisition and disposition book (also known as a "bound book"), and all other records relating to sales at least four times per year; (4) allow manufacturers to review sale incentive records or product promotion records maintained by the distributor at least four times per year; and (5) maintain and provide to the manufacturer state sales data on a month basis.

**General Provisions:** In addition to the foregoing, defendants should be ordered by the Court to implement the following distribution practices:

(1) conduct quarterly inspection of all downstream distribution partners and retailers;

(2) refuse to allow retail dealers to sell handguns at gun shows;

(3) institute an industry-wide program of warranty revocation upon individual resale of handguns, unless the firearm is resold only through a storefront stocking handgun retailer so that secondary sales are subject to background checks under the Brady Handgun Violence Prevention Act, 18 U.S.C. § 922;

(4) institute and contribute to a fund for the education, supervision and regulation of firearm distributors and retail dealers;

(5) maintain operative insurance; and

(6) create and enforce distributor and retail reseller agreements that contain appropriate provisions for retail dealers or distributors that are contained in this and the two previous paragraphs.

Plaintiff also asks that the Court issue an order:

(1)    requiring defendants to pay the costs of abating the nuisance in an amount estimated at no less than Five Million ($5,000,000) dollars for the establishment of the IOE; and

(2)    requiring defendants to pay the costs of abating the nuisance in an amount estimated at no less than Five Million ($5,000,000) dollars for the establishment of education programs designed to prevent gun acquisition and resultant violence among young people; and

(3)    requiring defendants to contribute an amount estimated at no less than Ten Million ($10,000,000) as well as a portion of their yearly revenues for such other and

further steps as may be necessary for the abatement and amelioration of the nuisance permanently.

WHEREFORE, plaintiff respectfully prays that the Court (i) adopt the foregoing Plaintiff's Proposed Findings of Fact and Conclusions of Law in whole; (ii) grant judgment in this matter in favor of plaintiff; (iii) grant plaintiff injunctive relief as set forth above and (iv) grant such other and further relief as may be just, appropriate and necessary.

Plaintiff first seeks an award of permanent injunctive relief directing as follows:

(1)    An order that each defendant be bound to establish the following mandatory requirements for each entity to which it transfers and sells guns, including other defendants, distributors and retailers:

        (a)    No sales to any retail entities (FFLs) that are not stocking storefront dealers, with stocking storefront dealer meaning a retail establishment with regular hours, public access, advertisements or signs indicating that it sells guns, operating in an area zoned for such activity, and operating primarily as a retail gun store or sporting goods store;

        (b)    Defendants will not sell to FFLs who do not maintain adequate liability insurance;

        (d)    Distributors will not sell to FFLs who do not maintain inventory requirements of $250,000;

        (e)    Distributors and retailers are not to engage in the sale of more than one (1) handgun to the same person in a thirty (30) day period;

        (f)    Distributors and retailers must allow manufacturers to review distributor's and retailer's handguns acquisition and disposition records, aka "bound books", and all other records relating to sales including sales incentive records, at least four (4) times per year;

(h)    Distributors and retailers must supply state sales and data to manufacturers.

(2)    An order that each defendant will implement the following mandatory procedures which it will comply with:

    (a)    Defendant will not market, distribute and sell handguns to other defendants, distributors and retailers who sell handguns at gun shows;

    (b)    Defendant will procure, keep and maintain adequate liability insurance;

    (c)    Defendant will conduct quarterly inspection of all distributors and retailers;

    (d)    Defendant, acting in conjunction with all other defendants herein, will institute an industry-wide program of warranty revocation upon individual resale of handguns, unless the firearm is resold only through a bona fide stocking handgun retailer so that secondary sales are subject to background checks under the Brady Handgun Violence Prevention Act, 18 U.S.C. §922.

    (e)    Defendant, acting in conjunction with all other defendants herein, will institute and contribute to a fund for the education, supervision and regulation of the approximately 16,000 stocking gun dealers.

(3)    An order requiring defendants to pay the costs of abating the nuisance in an amount estimated at no less than Five Million ($5,000,000) dollars for the establishment of an industry-wide safe sales monitoring and distribution regulatory agency to enforce the judgment of the Court.

(4)    An order requiring defendants to pay the costs of abating the nuisance in an amount estimated at no less than Five Million ($5,000,000) dollars for the establishment of education programs designed to prevent gun acquisition and resultant violence among young people.

(5)    An order requiring defendants to contribute an amount estimated at no less than Ten Million ($10,000,000) for such other and further steps as may be necessary for the abatement and amelioration of the nuisance.

Dated:  New York, New York
       June 9, 2003

Respectfully submitted,

Law Office of Elisa Barnes
Attorney for Plaintiff, NAACP
Office and P.O. Address
111 Broadway, 4th Floor
New York, New York 10006
By:  Elisa Barnes
       Monica Connell

National Association for the Advancement
Of Colored People, NAACP
4805 Mt. Hope Drive
Baltimore, MD
By:      Dennis Hayes
            Angela Ciccolo

Educational Fund to Prevent Handgun
Violence
1023 15th St. N.W., Ste. 600
Washington, D.C. 20005
By:      Sayre Weaver
            Carolyn Morrisette
            Joshua Horowitz

Violence Policy Center
1140 19th St. N.W., Ste. 600
Washington, D.C. 20036
By:      Matthew Nosanchuk

Brady Center to Prevent Handgun Violence
1225 Eye St. N.W., Ste. 1100
Washington, D.C. 20005
By:      Elizabeth Haile